NATIONAL LABOR RELATIONS BOARD *v.* FALK CORPORATION.

No. 460. Argued December 8, 11, 1939.—Decided January 2, 1940.

*Mr. Charles Fahy*, with whom *Solicitor General Jackson* and *Messrs. Robert B. Watts, Laurence A. Knapp,* and *Mortimer B. Wolf* were on the brief, for petitioner.

*Messrs. A. J. Engelhard* and *Leon B. Lamfrom* for the Falk Corporation, and *Mr. Giles F. Clark* for the Independent Union of Falk Employees, respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

Upon charges filed by the Amalgamated Association of Iron, Steel, and Tin Workers of North America, Lodge No. 1528, the Labor Board found that respondent, an employer conceded to be engaged in interstate commerce, had, in violation of the National Labor Relations Act, interfered with its employees' free right to self organization and had fostered and dominated a company union called the Independent Union.[1] Respondent was ordered to cease and desist from such interference and domination; to disestablish the company union completely, and to post notices in its plant of compliance with the Board's

---

[1] 49 Stat. 449, 452, § 8.

order. At the same time and in a proceeding consolidated [2] with the determination of the alleged unfair labor practices, the Board, also upon petition of Amalgamated, directed an election of a representative for collective bargaining on a ballot to contain the Amalgamated and the Operating Engineers—a participant in the consolidated hearing—but not the Independent.

On petition by the Board for enforcement of its order, the Court of Appeals concluded [3] that "the order of the Board is valid and . . . its petition for enforcement . . . is . . . granted." But, of its own volition, the court provided in its final order "that the . . . employees shall remain free to choose at the coming election, or any future election held or conducted pursuant to the provisions of the . . . Act, the Independent Union to represent them in labor relation dealings with respondent"; and that respondent be permitted to add to the notices in its plant the qualification that the Independent would be disestablished and unrecognized only "until and unless . . . [the] employees freely and of their own choice select the Independent Union as their representative. . . ." [4]

In its petition for certiorari, the Board contended that the court was without jurisdiction to review a direction of election and that, apart from the question of jurisdiction, the court had improperly interfered with the discretion given the Board by the Act. We granted certiorari to review these important questions. [5]

The first of the two consolidated proceedings before the Board was based upon the charge of the Amalgamated, a labor organization, that respondent had engaged in unfair labor practices contrary to § 8 (1), (2), (3) and

[2] *Id.*, § 9 (c).
[3] 102 F. 2d 383, 390.
[4] 106 F. 2d 454, 456, 457.
[5] *Post*, p. 544.

(5) of the Act. As already noted, the Board found respondent had interfered with its employees' free choice of a bargaining agent in violation of 8 (1), (2) and (3). Because there was no clear showing that the Amalgamated then represented a majority of the employees, the Board did not sustain the charge that respondent's refusal to bargain collectively with Amalgamated amounted to an unfair labor practice under 8 (5).

The second phase of the Labor Board's action was taken pursuant to § 9 (c)[6] of the Act, authorizing the Board to investigate and ascertain representatives of employees for collective bargaining. As expressly permitted by subsection (c), the Board conducted this investigation, itself a distinct proceeding, "in conjunction with a proceeding under section 10" and rendered its "Direction of Election" at the same time the order relative to the unfair labor practices was entered "under section 10." It was this "Direction of Election" that provided for inclusion on the ballot of Amalgamated (C. I. O.) and the Operating Engineers (A. F. L.), but omitted the Independent. The election was not actually to be held until after the Board was "satisfied that the effects of the company's unfair labor practices . . . [had] been dissipated by" compliance with the order to cease and desist and to disestablish the Independent.

When the Board petitioned the Court of Appeals for enforcement of its order against respondent, it filed a transcript of the entire consolidated proceedings held under 9 (c) and 10 (c).

---

[6] § 9(c), 49 Stat. 453: "Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 10 or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives."

Affirming the finding of unfair labor practices and order made by the Board under 10 (c), the court considered its power to act at an end if nothing had been before it "but the terms of an election by the employees about to take place." But the court held, one judge dissenting, that it did have jurisdiction to attach a condition to the Board's order whereby Independent might become a candidate in the proposed election because it was "disposing of a labor dispute case wherein the proceedings . . . [had] gone beyond mere plans by the Board for the calling of an election" and therefore had before it "for final disposition, the matter of the selection of the bargaining agent." Having thus found jurisdiction in itself to make "final disposition . . . of the selection of the bargaining agent," the court thought it necessary so to condition the Board's order as to prevent the elimination "for all time [of] one of the candidates—the Independent Union."

Respondent and the intervening Independent (company) union here contend that the court below did not actually modify the Board's "Direction of Election," but if deemed to have done so, the modification was authorized under either § 9 (d) or § 10 (e).[7] They also support

---

[7] "Sec. 9.

"(d) Whenever an order of the Board made pursuant to section 10 (c) is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section, and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsections 10 (e) or 10 (f), and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

"Sec. 10.

"(e) The Board shall have power to petition any circuit court of appeals . . . within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person re-

the result below on the ground that, as the court below believed, the Board .vas without power to keep the company union—if purged from company influence—from the ballot in a future election to select a bargaining agent, because such proscription would impair the guarantee in § 7 of the Act that employees may bargain collectively through representatives of their own free choice.

*First.* We think it apparent that the conditions attached by the court to the Board's order operated as a modification of the Board's Direction that Independent be omitted from the ballot in the coming election. In conditioning the Board's order, the court acted, as it said, "that the coming election shall be free, uninfluenced by the employer, and unhampered by any election order which eliminates [the Independent] as a contender." In effect, the court's qualification of the Board's order judicially pronounced—in advance of the election—that election methods considered "suitable" by the courts rather than by the Board must be followed. But § 9 of the Act vests power in the Board, not in the court, to select the method of determining what union, if any, employees desire as a bargaining agent; to this end, the Board "may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives."

---

sides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall certify and file in the court a transcript of the entire record in the proceeding, including the pleadings and testimony upon which such order was entered and the findings and order of the Board. Upon such filing, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board. . . ."

Nor can authority for such anticipatory judicial control of election methods be found in § 9 (d) which permits a review only in those cases in which the Board makes an order relating to labor practices found to be unfair as a result of a prior certification of a selected bargaining agent.[8] Here, the Board's order that the employer cease its unfair practices, disestablish the company union and post notices was not "based in whole or in part upon facts certified" as the result of an election or investigation made by the Board pursuant to § 9 (c). The proposed election here has not even been held and consequently no certification of a proper bargaining agent has been made by the Board. Until that election is held, there can be no certification of a bargaining representative and no Board order—based on a certification—has been or can be made, so as to invoke the court's powers under 9 (d).

The fundamental error of the court below lay in its assumption that there was before it "for final disposition, the matter of the selection of the bargaining agent." The court has no right to review a proposed election and in effect to supervise the manner in which it shall thereafter be conducted.[9] There can be no court review under 9 (d) until the Board issues an order and requires the employer to do something predicated upon the result of an election.

Since this employer has not been ordered by the Board to do anything predicated upon the results of an election the court had no authority to act under 9 (d).

*Second.* The company and Independent contend, as the court below held, that the Board's order of disestablishment—eliminating the Independent from the coming election even though purged of company influence—violates § 7 [10] of the Act which guarantees the right of

---

[8] *American Federation of Labor* v. *Labor Board, ante,* pp. 406, 409.

[9] *Labor Board* v. *International Brotherhood, ante,* p. 413.

[10] § 7: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through rep-

employees to choose their own bargaining representatives. On this premise, they argue that under the power in 10 (e) to modify orders of the Board, it was the duty of the court below to alter the Board's order of disestablishment so as to protect the right of the employees to choose the Independent if purged of company domination prior to the contemplated election.

On the contrary, the Board reached the conclusion that full protection of the employees' right freely to choose bargaining representatives required complete disestablishment effecting elimination of the Independent as a candidate. The findings of the Board, on which it reached this conclusion, in part were:

Shortly after the passage of the National Industrial Recovery Act in 1933,[11] respondent brought into being a company dominated union of its employees called the "Works Council" which functioned under company control until April, 1937. At that time, the A. F. of L. and the C. I. O. were making intensive efforts to organize respondent's employees in the face of respondent's hostility. As the campaign of the outside unions progressed, the company's personnel manager arranged, for April 12, the first of four meetings, held by Representatives of the Works Council during working hours in the company's plant hospital; in the course of these meetings there was a suggestion that the company would advance the date of a proposed wage income to influence the employees' choice of a union, and the necessity for prompt incorporation "because the C. I. O. was working in the plant" was made clear; April 18, a meeting was held off of respondent's property, but no definite form of organiza-

resentatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

[11] 48 Stat. 195, 198.

tion was decided upon; April 20, after conferring with an attorney whom respondent's president had suggested, three employees incorporated the Independent and notified respondent that it was ready to bargain collectively for some four hundred employees; on April 23, respondent recognized the Independent as the bargaining unit for all its employees upon the statement of the three incorporators, without proof, that they represented a majority of the employees.

In summary, the Board stated that respondent had used the Independent "as a convenient weapon to prevent the exercise of its employees' rights to self-organization and collective bargaining." And the court below, in approving the findings of the Board, held that the testimony showed that the company "earnestly endeavored to prevent the unionizing of its employees and when the inevitable became imminent, it sought to dominate the formation, organization and activities of the" company union. The evidence abundantly supports the concurrent findings of the Board and the court below.[12]

From these findings the Board justifiably drew the inference that this company-created union could not emancipate itself from habitual subservience to its creator, and that in order to insure employees that complete freedom of choice guaranteed by § 7, Independent must be completely disestablished and kept off the ballot.

Congress has intrusted the power to draw such inferences to the Board and not to the courts.[13] In order that 9 (c) might be an effective means of selecting freely chosen representatives for collective bargaining as guaranteed by § 7, the Board acted within its power in dis-

---

[12] Cf. *Illinois Central R. Co.* v. *Interstate Commerce Comm'n*, 206 U. S. 441, 466.

[13] *Labor Board* v. *Greyhound Lines*, 303 U. S. 261, 271; *Labor Board.* v. *Newport News Shipbuilding & Dry Dock Co., ante,* p. 241.

establishing Independent so as to bar it from considera-tion as an employees' representative.[14]

*Third.* The court also modified the Board's order by omitting the requirement that the notices to be posted in the plant contain a statement that the company would "cease and desist" from its unlawful activities. As stated in the first opinion of the court below,[15] the purpose of the Board in requiring the company to publish notices assuring its employees that it would "cease and desist" had been "to convey to the employees the knowledge of a guarantee of an unhampered right in the future to de-termine their own labor affiliations." Knowledge on the part of the men that the company would cease and desist from hampering, interfering with and coercing them in selection of a bargaining agent, which the Board found the company had done successfully in the past, was es-sential if the employees were to feel free to exercise their rights without incurring the company's disfavor. But the notices as permitted by the court's modifying order not only failed to assure the men that the company would cease its unlawful and coercive practices, but—backed with the prestige of a formal court order—told the men that Independent, while in terms disestablished for the time being, was still available for selection by the em-ployees. Thus the modified notices neither renounced

[14] Report of House Comm. on Labor, House Report No. 1147, 74th Cong., 1st Sess., pp. 17–19: "It is of the essence that the rights of em-ployees to self-organization and to join or assist labor organizations should not be reduced to a mockery by the imposition of employer-controlled labor organizations, particularly where such organizations are limited to the employees of the particular employer and have no potential economic strength."

[15] The court first affirmed the findings and order of the Board, 102 F. 2d 383; it wrote a second opinion rejecting the Board's objection to the final decree embodying the disputed conditions to the Board's order, 106 F. 2d 454.

the company's unlawful practices nor promised their abandonment, and left as a candidate the Independent, toward which the unrenounced unlawful activities of the company had been directed. We think the plant notices as modified by the court's order fell far short of conveying "to the employees the knowledge of a guarantee of an unhampered right in the future to determine their labor affiliations."

Other contentions of respondent have been considered and found without merit.

The court below committed error in modifying the Board's order. Accordingly, the cause is remanded to the Court of Appeals with instructions to enforce the Board's order without any modification.

*Reversed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.