DANIEL CONSTRUCTION COMPANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Intervenor.

UNITED ASSOCIATION OF JOURNEY-MEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING IN-DUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Daniel Construction Company, Inc., Intervenor.

Nos. 9347, 9414.

United States Court of Appeals Fourth Circuit.

Argued Sept. 30, 1964.

Decided Jan. 7, 1965.

No. 9347:

Robert T. Thompson and Knox L. Haynsworth, Jr., Greenville, S. C. (Thompson, Ogletree & Haynsworth, Greenville, S. C., on brief), for Daniel Const. Co.

Melvin Pollack, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Margaret M. Farmer, Atty., N. L. R. B., on brief), for National Labor Relations Board.

Patrick C. O'Donoghue, Washington, D. C., O'Donoghue & O'Donoghue and Martin F. O'Donoghue, Jr., Washington, D. C., on brief), for United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of United States and Canada, AFL–CIO.

No. 9414:

Patrick C. O'Donoghue, Martin F. O'Donoghue, Jr., and O'Donoghue & O'Donoghue, Washington, D. C., on brief for Petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack and Margaret M. Farmer, Attys., N. L. R. B., on brief for respondent.

Robert T. Thompson, Knox L. Haynsworth, Jr., and Thompson, Ogletree & Haynsworth, Greenville, S. C., on brief for intervenor.

Before FAHY,* BRYAN and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

Petitioner, Daniel Construction Company (hereinafter Daniel), has lodged this appeal to have us review and set aside two orders of the National Labor Relations Board. The first is a cease-and-desist order which rests upon a NLRB determination that the company

* Of the District of Columbia Circuit, sitting by designation of the Chief Justice.

has interfered with, restrained, and coerced its employees in violation of section 8(a) (1) of the National Labor Relations Act, as amended (hereinafter the Act).[1] The primary contention of the company regarding this order is that there is no substantial evidence in the record considered as a whole to support a finding that it has committed unfair labor practices. The second order to which Daniel objects is one directing that a new representation election be conducted for Daniel employees.

In order to fully understand the issues raised by this appeal, certain background facts should be stated. The record indicates that Daniel is a large South Carolina corporation engaged in the building and construction industry as a general contractor. In 1961 it was the second largest industrial contractor in the United States, with extensive domestic and foreign operations. At that time the company was divided into five divisions, the largest of which was the Greenville Division which employed some 6,000 workers on projects scattered throughout Florida, Georgia, Alabama, Tennessee, and the Carolinas.

On February 24, 1961, a petition was filed by the United Association of Journeymen and Apprentices of the Plumbing & Pipefitting Industry in the United States and Canada, AFL–CIO (hereinafter the union) requesting certification as the bargaining agent for the Daniel mechanical employees [2] working for the Greenville Division. After the appropriate hearings, a representation election was ordered held on November 16, 1961; at this election the union was defeated by a vote of 684 to 247.[3] On February 8, 1962, the union filed both unfair labor practice charges and objections to conduct by Daniel affecting the result of the representation election.[4] After due consideration the Regional Director recommended that a hearing be held on certain of the objections to conduct; he also ordered that a complaint be issued on some of the unfair labor practice charges. Since substantially the same conduct was involved in both the election conduct objections and the unfair labor practice charges, the Board on March 5, 1963, over the protest of Daniel, ordered the consolidation of the representation case and the unfair labor practice case for a hearing before a trial examiner.

On January 31, 1964, after a hearing and the subsequent issuance of an Intermediate Report by the trial examiner in the consolidated case, the NLRB, agreeing mostly but not completely with the trial examiner, found that certain preelection conduct of the company constituted violations of section 8(a) (1) of the Act and ordered Daniel to cease and desist therefrom. The Board found further that the Daniel conduct in issue had interfered with the employees' freedom of choice at the representation election, and it, therefore, ordered that the prior election be set aside and that a new election be held when the coercive employer interference ceased. On February 3, 1964, Daniel filed a petition of appeal seeking a review of both aspects of the Board decision in the consolidated case.

## I.

We deal first with the appeal from the Board's order in the representation case that a new election he held and the chal-

---

1. 29 U.S.C.A. § 151 et sequi.

2. This group included the pipefitters, plumbers, welders, and their helpers.

3. Included in these vote totals are ballots from 337 individuals who were not in the employ of Daniel on the day of the election but who were determined by the Board as included in the appropriate bargaining unit because they had worked for the company for as much as 30 days during the preceding 12 months or 45 days during the preceding 24 months and some time during the preceding 12 months.

4. The objections to conduct were part of the representation case which began with the union's petition for certification. This was styled Case No. 11–RC–1453 by the NLRB. The unfair labor practice case began when the union filed the unfair labor practice charges after the election. This case was identified by the Board as Case No. 11–CA–1893.

lenge by Daniel as a part of that appeal to the legality of the company unit determined by the Board as the appropriate one for collective bargaining purposes. We dismiss the petition of appeal insofar as it concerns a review of the representation case orders, since we think it clear that this court is without jurisdiction at this time to review the NLRB orders in that case. AFL v. NLRB, 308 U.S. 401, 406, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940); NLRB v. IBEW, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354 (1940).[5] Only with respect to final orders of the Board in unfair labor practice cases has Congress, by section 10(f) of the Act, seen fit to expressly authorize judicial review, and we do not read section 9(d), the only subsection of that section of the Act dealing particularly with representation proceedings which even refers to judicial review, as expanding by implication the scope of appellate jurisdiction created by the express statutory provision. Section 9(d) merely provides that when review is sought in an unfair labor practice case which is based in whole or in part upon a Board certification in a representation case, the record in the representation case shall be included in and considered by the court as an integral part of the entire record in the unfair labor practice case. Neither the Taft-Hartley Act nor the Administrative Procedure Act has enlarged the Wagner Act provisions for appellate review of NLRB orders. Timkin-Detroit Axle Co. v. NLRB, 197 F.2d 512 (6 Cir. 1952); Amazon Cotton Mill Co. v. Textile Workers Union, 167 F.2d 183, 186 (4 Cir. 1948). To the contrary, in the course of enacting the Taft-Hartley Act, Congress expressly rejected a House proposal which would have permitted judicial review of Board orders in representation cases. See 93 CONG. REC. 6444 (1947) (remarks of Senator Taft).

■■ The cases make it abundantly clear that there can be no review under section 9(d) of the Act of Board action in a representation case until the Board has issued an order which requires the employer to do something predicated upon the results of an election. NLRB v. Falk Corp., 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396 (1940); E. I. Du Pont de Nemours & Co. v. NLRB, 116 F.2d 388, 401 (4 Cir. 1940), cert. denied, 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529 (1941). The consolidation of the representation and unfair labor practice cases by the Board here cannot help the petitioner, since that administrative act cannot confer jurisdiction upon this court to review the orders in the representation proceeding now when no such jurisdiction exists under the governing statute. Hendrix Mfg. Co. v. NLRB, 321 F.2d 100, 106 (5 Cir. 1963); NLRB v. La Salle Steel Co., 178 F.2d 829, 832 n. 1 (7 Cir. 1949), cert. denied, 339 U.S. 963, 70 S.Ct. 996, 94 L.Ed. 1372 (1950). Nothing in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the case relied upon by Daniel as supporting appellate review of the Board action in the representation case at this stage of the proceedings, alters the principles stated above. The Supreme Court was careful to distinguish, with the following language, its decision there from the accepted interpretation of the statutory limitations upon appellate review of NLRB orders in representation cases:

"This suit is not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." 358 U.S. at 188, 79 S.Ct. at 184.

---

5. "The direction for an election is but a part of the representation proceeding authorized by § 9(c) and is no more subject to review under § 10(f) than is a certification which is the final step in such a proceeding and which we have just held [in AFL v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347] Congress has excluded from the review afforded by that subdivision." 308 U.S. at 414–415, 60 S.Ct. at 307.

Our decision here does not deny Daniel *its day in court* on the objections which it has raised to the Board's determinations in the representation proceeding; it merely forecloses Daniel from raising those objections on *this* day in court. Daniel will be entitled to a review of the Board action in the representation case if the following succession of events occurs: the union wins the new election and is certified by the NLRB as the bargaining agent for the employees in question, the company thereafter refuses to bargain with the union because it feels the election was defective in some way, and the Board in a subsequent unfair labor proceeding adjudges the company to be in violation of section 8(a) (5) of the Act and orders it to bargain with the union as certified. Boire v. Greyhound Corp., 376 U.S. 473, 477, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); NLRB v. Falk Corp., supra; Volney Felt Mills v. LeBus, 196 F.2d 497 (5 Cir. 1952).

## II.

We turn next to the assertion by Daniel that the record is barren of substantial evidence to support the Board's findings in the unfair labor practice case. The Board found that Daniel had violated section 8(a) (1) of the Act by the following conduct:

1. Coercive pre-election speeches delivered by Executive Vice President Buck Mickel and Mechanical Department Manager Ted Johnson to assembled groups of employees at various job sites.

2. Instructions given prior to the election by Daniel supervisory personnel to three foremen at the American St. Gobain project to talk to their men concerning the union, to find out how they were going to vote, and to report back.

3. Interrogation of employees at three of the major construction projects by Daniel foremen and/or other supervisory personnel about their feelings regarding the union and the forthcoming election.

4. Several secret pre-election polls conducted by foreman Archie Stringer among the members of his crew at the Bowaters project.

5. Threats of reprisal for union activities made by several Daniel supervisory personnel to employees Jess Humphreys, James Medlock, and Nathan Harrison.

Both in its brief and in oral argument before this court, Daniel has raised a variety of defenses which, if accepted, might require a reversal of the Board's decision. Since these defenses can be considered appropriately only in the context of specific conduct, we proceed to a seriatim discussion of the Board's findings regarding the unfair labor practices.

### A. The Speeches

It is undisputed that Vice President Mickel and Mechanical Department Manager Johnson made visits to the larger Daniel job sites in the Greenville Division to speak to the employees during a period of approximately six weeks preceding the election. The testimony indicated that about fifteen projects were visited and that between twenty-five and thirty speeches were made in which support for the company was solicited. While the speakers did not use a prepared text, it appears that all the speeches were substantially the same and that each one contained these three main points: (a) that there would be a loss of employment if this division of the company was unionized (supposedly because of adverse customer reaction) but continued employment if the workers rejected the union; (b) that the company firmly intended in the future to maintain the existing practice of hiring solely at the gate by individual supervisors at each construction site, regardless of the outcome of the election; and (c) that even if the union were victorious, there would be an extended delay in recognizing it as the bargaining agent because the company planned to contest the legality of the election, with the result that the outcome might not be finally settled for

as long as ten years. The trial examiner rejected the company's assertion that these statements were protected expressions within the meaning of section 8(c) of the Act; he found the speeches, considered as a whole, to be coercive, and he stated that finding in these words:

"Although any one of these [statements] taken alone might be considered to be the expression of views, argument, or opinion, protected by Section 8(c) of the Act, they, in my opinion, as a cohesive combination presented to the voters, tended to restrain employees in the exercise of their right to vote freely by instilling in them a foreboding of damage through loss of employment if the Union were selected, as contrasted with maintenance of present employment and securing of future jobs through familiar, and friendly foremen if the Union were rejected, all coupled with consistent stress on the futility of the election because of Respondent's [Daniel's] intention to keep its present hiring practices regardless of the outcome, and to litigate the issues for a decade, in any event. Respondent's campaign, as I see it, cannot be viewed as merely a restrained expression of its legal position, or a prediction of the economic consequences of unionism imparted to employees in a noncoercive manner. I find in Respondent's speeches a threat to the economic security of the employees for which Respondent must take the responsibility even though the loss of employment was attributed to adverse customer reaction, and implied promises of favorable treatment on future jobs, if the employees rejected the Union in the election."

■ The Board accepted the examiner's finding and conclusion on this point without discussion. Daniel here has argued at great length that each of the pre-election statements considered separately is lawful and that this being so, a combination of these statements could not result in illegal speech. Daniel's basic proposition, simply stated, is that the whole cannot be greater than the sum of its parts. Even if we assume that each of the key statements in the Daniel speeches considered separately would be lawful (neither the examiner nor the Board made a ruling to this effect), it still does not follow that we must accept the proposition pressed upon us by the company. Daniel may have accurately stated an accepted rule of mathematics, but words and speech are not governed entirely by mechanical mathematical concepts. Words and phrases, each lawful when considered alone, can be united in such a fashion as to yield an improper end product. As Judge Learned Hand observed more than two decades ago:

"Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part. What to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart. The Board must decide how far the second aspect obliterates the first." NLRB v. Federbush Co., 121 F.2d 954, 957 (2 Cir. 1941).

■■ Furthermore, we think it settled that whether an employer has employed language which is coercive in its effect is a question essentially for the specialized experience of the NLRB. NLRB v. Brown-Dunkin Co., 287 F.2d 17, 18 (10 Cir. 1961). The Board here concluded that the cohesive combination of the Daniel statements about future events resulted in employee coercion, and the record before us contains ample substantial evidence to support such a finding.

## B. Coercive Instructions to Foremen

The trial examiner and the Board found that Daniel violated the Act by giving coercive instructions to several of its foremen at the American St. Gobain project. There was credited testimony that three foremen—Bayless Long, Jack Eades, and Homer Lane—had been instructed by their superiors to determine from conversations with their men how the employees were going to vote in the election and to report this information back to Daniel supervisors. It would appear from the record that none of the foremen followed the instructions, and foremen Eades and Long openly informed their men what had been requested of them. The mere fact that the instructions were not followed, however, does not preclude a finding of coercion, for a disclosure to employees that management has set in motion a chain of events to ascertain and identify union adherents can clearly restrain their freedom in expressing their sentiments regarding organization. NLRB v. Wix Corp., 309 F.2d 826, 839 (4 Cir. 1962). Nor is the possible coercion in the "spying" technique requested here destroyed because these foremen were union members, as the company asserts. Foremen for Daniel, regardless of their union affiliation, exercised supervisory functions—assigning and directing work, recommending pay raises, and determining layoffs. With respect to the company argument that it was not responsible for the conduct of its foremen who belonged to the union, the NLRB observed that "not only were [these] foremen agents of Respondent when they engaged in misconduct but * * * they were acting under express authorization of management * * *." We think there is substantial evidence in the record to support a finding of employee coercion from the instructions to the foremen, and we affirm the Board on this point.

## C. Employee Interrogation

The trial examiner credited testimony that five employees were questioned by Daniel supervisory personnel about the upcoming election; some of these employees were asked how they personally felt about the election. Some of the supervisors denied having made the inquiries attributed to them, but it is the responsibility of the Board, and not this court, to resolve factual conflicts in the testimony and questions of the credibility of witnesses. NLRB v. Lester Bros., Inc., 301 F.2d 62, 68 (4 Cir. 1962).

Even conceding the existence of employee interrogation, Daniel asserts that interrogation is not per se unlawful and that whether it violates the Act depends upon the particular factual situation in a given case. Such appears to be the law. NLRB v. Prince Macaroni Mfg. Co., 329 F.2d 803, 806 (1 Cir. 1964); NLRB v. Power Equip. Co., 313 F.2d 438, 440, modified on another point, 319 F.2d 861 (6 Cir. 1963); Lincoln Bearing Co. v. NLRB, 311 F.2d 48, 50–51 (6 Cir. 1962). Such a legal standard does not change the result here, however, for, considering the questioning of and the discussion with the employees in this case against the total background of facts and circumstances, there is substantial evidence to support a finding by the Board that such conduct was coercive and thus illegal. The considerations to which Daniel has directed our attention —that the interrogation was not coercive because the conversations in some instances were with close personal friends of the supervisor who not only were not intimidated by his remarks but who argued the union side with him, that in any case the statements made were only the personal opinion of the speaker, that the questions about the election and union feelings were generally vague, ambiguous, and occasional rather than specific and persistent, etc.—were matters to be considered along with all the other circumstances present in this case. While they might have been consistent with a finding of no coercion, these factors do not destroy the inference of coercion which the Board could and did draw from the interrogation, considering the other unfair labor practices of which Daniel

was adjudged guilty, and they do not require a reversal of the Board on this point.

### D. The Pre-election Polls

▉ Prior to the election foreman Archie Stringer conducted three or four secret polls among the members of his crew at the Bowaters project to ascertain employee support for the union. The trial examiner did not find the conduct to be legally improper, primarily because he found that it was conducted by Stringer as a personal venture and for his own satisfaction. The NLRB reversed the examiner on this point, however, pointing out that several polls were taken, all of them just prior to the election; that the taking of these polls was consonant with the company instructions to some of its foremen to ascertain the union sympathies of the employees; that there was no legitimate basis for these polls; and that they occurred in an atmosphere of company hostility to the union and during a period when Daniel was guilty of several unfair labor practices. The considerations noted by the Board, when considered with the other circumstances in this case, are ample evidence of record to support a finding that a violation of

section 8(a) (1) resulted from the conducting of the polls.[6]

### E. Threats of Reprisal for Union Activities

▉ The threats of reprisal found by the Board occurred primarily at the C.V.N.P.A. project. However, it was also found that foreman John Denny at the American St. Gobain project advised employee Jess Humphreys, an open union adherent, that "it would be hard to work with Daniel if the Union won the election." At the C.V.N.P.A. site, the examiner found that supervisor Jasper Drum told employee James Medlock that he would never work for Daniel again if he served as a union observer at the election.[7] There was also testimony that foreman Drum asked Medlock to talk with another employee, Nathan Harrison, and warn Harrison that Mechanical Superintendent Ernest Grigsby was going to run him off the job if he continued to solicit for the union.[8] Finally, it was found by the examiner that foreman Frank Hall and superintendent Grigsby threatened employee Harrison with loss of employment if he continued his union activity.[9]

6. Since the Board's finding in this respect is supported by substantial evidence in the record, the contrary conclusion of the trial examiner is entitled to no special weight. NLRB v. Thomason Plywood Corp., 222 F.2d 364, 365 (4 Cir. 1955).

7. Foreman Drum denied ever having made such a statement, but the examiner credited Medlock. In its brief here, Daniel discusses at length the question of Medlock's credibility and the alleged contradictions in his testimony. Daniel charges that Medlock fabricated the whole story, and to support this assertion, its counsel point out that despite the fact that Medlock did serve as an election observer for the union, he not only was not fired but after voluntarily leaving the employ of Daniel, but he was later rehired at the C.V.N.P.A. project by Drum. As we have observed earlier, issues of credibility and the resolution of factual controversies are matters for the consideration of the Board, not this court, and we see no need to comment further upon this matter.

8. The Daniel position on this particular claim was that such a statement was never made and, alternatively, even if it was, it was merely a warning that the company intended to enforce its no-solicitation rule. Although there was testimony that Harrison had wandered away from his work station to talk with fellow employees on occasion, no Daniel official testified that Harrison was plainly and specifically warned about the no-solicitation rule. Daniel in its brief attempts to construe certain language as containing an implied warning about soliciting on the job, but its position there is tenuous. Moreover, the determination of the intent with which a certain thing is done is a matter for the Board to resolve, and in its resolution of this case, the company's arguments were rejected. We think the Board's determination on this point is supported by substantial evidence in the record.

9. The examiner credited testimony that foreman Hall, in the presence of superintendent Grigsby, told Harrison: "If

 From these findings, especially when viewed in conjunction with the other Daniel conduct, the Board could reasonably conclude that employee coercion occurred. Its finding on this issue is supported by substantial evidence, and we must affirm it.

### F. Defense of Isolated Incidents

 In view of the foregoing discussion and findings, the asserted defense of isolated incidents hardly warrants serious consideration. Although there were numerous employment sites involved in this election,[10] a majority of the eligible on-the-job voters were employed at four particular projects.[11] Even excluding for a moment the coercive pre-election speeches by Mickel and Johnson, independent coercive conduct was found to have occurred at each of these four large employment sites. Moreover, not only foremen but also high Daniel supervisory personnel were found to have engaged in coercive conduct. Given these circumstances, we dismiss Daniel's isolated incidents defense as without merit.

### III.

This court also has before it a petition by the union seeking modification of the Board's order with respect to certain alleged conduct by Daniel supervisory personnel not heretofore mentioned. The trial examiner and the Board rejected the union's contention that Daniel was guilty of other section 8(a) (1) violations because of coercive statements allegedly made by foremen Dale Blevins and Roy Baker and Mechanical Superintendent Arthur McAllister.

 There were findings below that the statements attributed to Blevins and Baker (and denied by both of them)

were never made and that the statement by McAllister was too ambiguous to constitute a threat of economic reprisal if the employees addressed did not support the union. We think the record contains substantial evidence to support each of these findings, and they are therefore binding upon us. NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); NLRB v. Southland Mfg. Co., 201 F.2d 244 (4 Cir. 1952).

### IV.

The petition of appeal by Daniel, insofar as it seeks a review of the Board's action and orders in the representation case, is dismissed as not within the jurisdiction of this court at this time.

The petition by the union to modify the Board's order in the unfair labor practice proceeding with respect to the conduct from which no section 8(a) (1) violations were found is denied.

The petition of the company to set aside the Board's findings and order regarding the unfair labor practices is denied, and the cross-petition of the Board to enforce its order is granted.

Petition denied and order of the Board enforced in No. 9347; petition denied in No. 9414.

ALBERT V. BRYAN, Circuit Judge (dissenting in part):

The fair and forceful presentation of the case in the majority opinion notwithstanding, I think the Board's determinations of § 8(a) (1) violations should not be accepted. In my judgment there is no foundation of substance in the record for these conclusions.

The condemned deportment of the employer consists of expressions of free

---

you've got to talk, talk Daniel, Daniel pays your grocery bills and all the rest of your bills; that's what I do. If you think anything of your job that's what you'd better do."

10. Daniel maintains that over fifty projects located throughout a six state area were involved, but the NLRB only arranged polling places at thirty-two job sites be-

cause only a few people were employed at a number of Daniel projects.

11. American St. Gobain (Kingsport, Tenn.), over 140 eligible employees; National Aniline (Irmo, S.C.), 275–300; C.V.N.P.A. (Parr, S.C.), over 100; and Bowater (Catawba, S.C.), either over 130 or 30–50.

speech, specifically allowed by § 8(c) of the Act, 29 U.S.C. § 158(c), if not a Constitutional privilege. We have indeed come to a servile economic state when it is unlawful for an employer to explain to his employees his reasons for opposing a union. Equally deplorable is the Board's view that ascertainment by the employer of his employees' attitude towards a union is illegal. Even a general inquiry as to how the election might go is denounced. Condemned also is the employer's insistence that despite the election outcome, it would hire its employees at the gate as always—certainly at this stage not an affront to union representation as an anticipatory refusal to bargain.

With these concepts I disagree. The only support for them is the ipse dixit of the Board—scarcely the equivalent of *"substantial evidence"*. Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128 (5 Cir. 1964); Salinas Valley Broadcasting Corp. v. N. L. R. B., 334 F.2d 604 (9 Cir. 1964); N. L. R. B. v. Calvert Dairy Prods. Co., 317 F.2d 44 (10 Cir. 1963); Lincoln Bearing Co. v. N. L. R. B., 311 F.2d 48 (6 Cir. 1962).

Typical of the unwarrantable inflation by the Board of its powers is the outlawing of the employer's assertion of an intention to litigate a Board ruling. The employer declared its determination to contest the voting eligibility formula promulgated by the Board. Anyone was permitted to vote if he had been employed as much as 30 days in the preceding 12 months or 45 days in the preceding 24 months, although not in the company's employment at the date of the election. Such an enlargement of the electorate is ex facie arbitrary, capricious and contrary to the definition of "employee" under § 2(3) of the Act, 29 U.S.C. § 152(3), and rightfully subject to protest in pais and in court. Yet for the protest the employer is found guilty by the Board, again on *"substantial evidence"*, of an unfair labor practice.

Despite this flagrantly invalid stretching of the franchise, the vote was overwhelmingly—684 to 247—against the union. This is per se proof, the Board seemingly finds, of employer-pressure upon employees to oppose the charging union. To me it is *substantial evidence* that the employees—presumably intelligent—did not want the union.

I would decline to enforce the § 8(a) (1) orders.