EX–CELL–O CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

INTERNATIONAL UNION, UNITED AU-
TOMOBILE, AEROSPACE AND AGRI-
CULTURAL IMPLEMENT WORKERS
OF AMERICA, UAW, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 24715, 24577.

United States Court of Appeals,
District of Columbia Circuit.

No. 24715 Argued April 14, 1971.

Decided June 9, 1971.

Mr. Stanley R. Strauss, Washington, D. C., with whom Mr. Kenneth C. McGuiness, Washington, D. C., was on the brief, for petitioner in No. 24,715 and intervenor in No. 24,577.

Messrs. Joseph L. Rauh, Jr., John Silard, Washington, D. C., and Stephen I. Schlossberg, Detroit, Mich., were on the brief for petitioner in No. 24,577.

Mr. Warren M. Davison, Deputy Asst. General Counsel, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Stanley R. Zirkin, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

These two cases, consolidated on appeal, involve an order by the National Labor Relations Board requiring Ex-Cell-O Corporation (Company) to bargain with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (Union). After determining that the Company's plant in Elwood, Indiana was an appropriate unit for collective bargaining purposes, the Board conducted an election in 1964; the Union won the election; in 1965, after administrative processes including a full hearing, the Board certified the Union as the exclusive collective bargaining representative for most of the plant's employees.[1] The Company declined to bargain with the Union in order to obtain a judicial test of the validity of the Board's certification,[2] which the Company still con-

---

1. On August 11, 1964, the Union filed a petition under § 9 of the National Labor Relations Act, 29 U.S.C. § 159 (1964), for designation as the exclusive bargaining representative of the Company's production and maintenance employees at its Elwood, Indiana plant. After a hearing, the Board's Regional Director issued an order on September 30, 1964, directing that an election be held at the plant under the Board's supervision on October 22, 1964. The Union won, 102 to 93, with one ballot challenged. On October 29, 1964, the Company protested the election, alleging that the Union had mailed to the employees a letter containing material misrepresentations of fact, so timed as to deny the Company an opportunity to reply effectively. The Company's objections were overruled by the Regional Director on December 29, 1964. On April 23, 1965, the Board granted the Company's request for review of that decision and directed a hearing, which was held in May, 1965. On July 15, 1965, the Hearing Officer entered a report recommending that the Company's objections be overruled. After consideration of the Company's exceptions, the Board affirmed the Hearing Officer and certified the Union on October 18, 1965.

2. Since there is no judicial review of certification proceedings as such, Ex-Cell-O had to refuse to bargain, be charged with violating the Act, and eventually, be ordered to cease and desist from the violation and to bargain with the Union. Such an order is reviewable in court. 29 U.S.C. § 160(e) & (f) (1964); see American Fed'n. of Labor v. NLRB, 308 U.S. 401, 406, 409, 60 S.Ct. 300, 84 L.Ed.

tended was erroneous because the Union had engaged in activity that rendered the holding of a fair election impossible. In 1970, the Board found that the Company's refusal to bargain violated §§ 8 (a) (1) & (5) of the National Labor Relations Act; [3] the Board ordered the Company to bargain with the Union on request.[4]

In No. 24,577, the Union petitioned for review of that part of the Board's order which denied special compensation for employees' losses for the period during which the Company refused to bargain with the Union after it had been certified. On March 19, 1971, we entered an order granting the Union's motion for summary reversal of the Board's denial of special relief to the extent of ordering a remand.[5] We will revert to that order subsequently. In No. 24,715, the Company petitioned for review of the order to bargain, and the Board cross-applied for enforcement of its order.[6]

## I. *No. 24,715—The Order To Bargain*

The disposition of this case turns on the validity of the Board's certification of the Union as collective bargaining representative for the Company's Elwood plant, and on the propriety of enforcing the employer's obligation to bargain despite the long delay between the initial refusal to bargain and the Board's decision. We uphold the certification and the Board's decision that the Company violated the Act, and we enforce

the Board's order directing the Company to bargain with the Union on request.

### A.

■■ The Company's primary claim is that a newsletter mailed to the employees by the Union's International Representative on October 19, 1964, three days before the election, contained substantial misrepresentations which undermined the fairness of the election, and hence the propriety of the Board's certification of the Union on the basis of the election. In balancing "the right of the employees to an untrammeled choice, and the right of the parties to wage a free and vigorous campaign," the Board sets aside an election only if a misrepresentation "involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a substantial impact on the election;" in addition, the Board will consider whether "the party making the statement possesses intimate knowledge of the subject matter," and whether the employees themselves "possessed independent knowledge with which to evaluate the statements."[7] The Hearing Officer, whose decision was affirmed by the Board, concluded that there was no such substantial misrepresentation about material facts and that insofar as there were questionable statements, they

347 (1940) ; NLRB v. Falk Corp., 308 U.S. 453, 458–459, 60 S.Ct. 307, 84 L.Ed. 396 (1940) ; NLRB v. International Bhd. of Elec. Workers, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354 (1940).

3. 29 U.S.C. § 158(a) (1) & (5) (1964).

4. Ex-Cell-O Corp., 185 N.L.R.B. No. 20, 74 L.R.R.M. 1740, 5 CCH Lab.L.Rep. ¶ 22,251, at 28,669–78 (Case No. 25–CA– 2377, Aug. 25, 1970, amended, Sept. 1, 1970).

5. International Union, United Automobile Workers v. NLRB, 145 U.S.App.D.C. ——, 449 F.2d 1046, No. 24,577 (Mar. 19, 1971).

6. *See* 29 U.S.C. § 160(e) (1964). The Company's petition was initially filed in the Court of Appeals for the Sixth Circuit, and transferred by that court in view of the Union's petition to review the Board's order, which was previously filed in this court in No. 24,577. *See* 28 U.S.C. § 2112(a) (1964).

7. Hollywood Ceramics Co., 140 N.L.R.B. 221, 224 & n. 10 (1962) ; *see* International Bhd. of Elec. Workers v. NLRB [Presto Mfg. Co.], 135 U.S.App.D.C. 197, 200, 417 F.2d 1144, 1147 (1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 556, 24 L.Ed.2d 496 (1970) ; United Steelworkers v. NLRB [Luxaire, Inc.], 129 U.S.App. D.C. 260, 263, 393 F.2d 661, 664 (1968).

were within the rule of *Hollywood Ceramics, supra* note 7, that the permissible latitude of election campaigning does not require absolute precision in statements, and that ambiguous or inarticulate messages which may be subject to different interpretation, "like extravagant promises, derogatory statements about the other party, and minor distortions of some facts" such as "frequently occur in communication between persons," do not constitute the kind of misrepresentation that leads the Board to set aside an election.[8] We conclude that insofar as this determination rests on a factual predicate there is support in substantial evidence, and insofar as it represents a determination as to the order that is appropriate in the light of this factual predicate there is no showing of abuse of the Board's discretion in determining whether to certify the representative chosen in the election.[9]

1. Our ultimate conclusion is that we affirm the Board's determination that the statements in the newsletter to which the Company takes exception are not the kind of substantial, material misrepresentation which invalidates an election. The newsletter is slanted rather than spurious or fraudulent, and for the most part there is some basis in fact for the statements made.

2. The newsletter said the Company discontinued cost of living wage increases and manipulated the annual improvement factor (AIF) for wage increases. The Company concededly did discontinue a separate review of cost of living allowance, and while it says to the court that these were not terminated but were rather integrated as part of a larger perspective for annual wage review, there is at least a legitimate question whether this change may not have smothered the quality and extent of the cost of living adjustment. The ultimate point is that the Union is stressing that there are shortcomings in the Company's handling of these matters, and that it can do better for the workers. This is the very stuff of electioneering, and hyperbole is tolerated unless wholly spurious.

3. As to the newsletter's claim that as a result of Ex-Cell-O's unilateral changes its workers suffered a loss of 14 cents per hour, the arithmetic does show—as Company counsel conceded—that the average annual amount of increase was 6–8 cents per hour during 1956–1959, whereas the data for later years show in years of: 1960: nil; 1961: 4 cents; 1962: 4–6 cents; 1963: 5–7 cents; 1964: 5 cents. Again there is a basis in fact for an assertion of a cumulative 14 cent discrepancy. And this cannot be condemned as the kind of fraudulent misrepresentation that vitiates an election, even though the Company has some explanations and qualifications that might well be more impressive to someone conducting an auditing function.

---

8. The Board also found that (1) the subject matter of the statements was within the intimate knowledge of the Company rather than the Union, the party making the statements, (2) the Company had adequate time to reply, did reply to some degree, and in any case, could have replied to similar statements in earlier newsletters sent out by the Union, (3) the employees themselves were in a position to know the true facts, and (4) the statements were not likely to have a substantial impact on the election. In a sense, all these determinations are inter-related. Thus the relative lack of intimate knowledge by the Union of the subject matter is inter-related with the conclusion that to the extent that the Union has deviated from the facts as they might be found by an impartial tribunal, the deviation falls within the zone of tolerable electioneering. However, the lack of misrepresentation substantial enough to undercut an election obviates the need to review the details of other determinations.

9. This court is not called upon to determine whether the Union's statements were true. It suffices that there is substantial evidence for the Board's factual predicate that the newsletter had some basis in fact, and that discretion has not been abused in the determination that any deviations from strict accuracy are not substantial enough to warrant overturning an election.

4. The newsletter asks the question whether it is the Company's plan to replace women with men in the performance of certain tasks. The same question was posed two months earlier in a newsletter that pointed out that men on lay-off had been recalled, while over 40 female employees on the seniority list had not been recalled.

So far as assertions are concerned, the newsletter says that some of the jobs filled by new male hires were formerly performed by women. The Board found a basis in fact, sufficient to avoid a misrepresentation so substantial as to undercut the election, in the fact that all hires for September 1963-October 22, 1964, were males, that one of these men was hired as a floor inspector, and that in the past at least some duties of a floor inspector had been performed by a woman.[10] We are satisfied that the evidence in support of the factual predicate (see note 10) is sufficient to avoid any conclusion that the Board's order is invalid in law.

While the Company has explanations as to why it changed its processes so that some vapor blast and belt-packing jobs formerly handled by women came to be performed by men, it was not improper for the Board to conclude that the Union was within legitimate campaigning in stressing the result—that women were not rehired—without pursuing the detailed explanations.

10. The Board, i. e., the Hearing Officer, found, J.A. 483:

Despite Converse's denials* that there
*It is well to note at this point that I found Converse a generally unreliable witness, evasive, antagonistic, extremely reluctant to answer question put to him by the Petitioner's counsel and the Regional Director's Representative, and prone to testify in conclusions rather than facts. Because of his attitude and demeanor, as well as his testimony, I credit Converse only to the extent that his testimony is consistent with any findings herein.

were any female floor inspectors he did admit that there were two or three female inspectors on the floor at some time in the past. Petitioner's Exhibit No. 1 shows that Juanita Powers was a female operator-inspector assigned to the supervision of the floor inspection supervisor sometime in 1960. That supervisor, Victor Whitenack, testified that this assignment lasted about nine months. I am unable to comprehend why an employee with the job classification of operator inspector who works full time on the floor inspection operation under the supervision of the floor inspection supervisor doing work which that supervisor admits is not the final inspection of *finished* blades done in the final inspection operation but the inspection of *unfinished* blades out on the floor close by the machines performing the separate steps of the manufacturing process, is not a floor inspector. She is not a final inspector, because she is not inspecting finished blades. And the classification of "operator inspector" does not remove her from the floor inspector job area absent some showing, not made here, that other inspectors are not similarly classified as operator-inspectors. It is clear to me from the record that Mrs. Powers, and possibly some other female employees, was a floor inspector sometime in the past.

In its reply brief (pp. 5-6) the Company refers to the assertion in the Board's brief "that Mrs. Powers had, as the Board found, been assigned in 1960 to inspect unfinished blades—admittedly, a floor inspector job task. We state flatly, however, that the Appendix references cited by the Board simply do not support either the Board finding or its present assertion; and we respectfully ask the Court to check such Appendix references."

On checking the citations we find the following, J.A. 151-153:

Redirect Examination

Q: (By Mr. McGuiness) Mr. Whitenack, do I understand that Mrs. Powers worked under your supervision?

A: Yes, sir.

Q: For a period of time?

A: Yes, sir.

Q: And when she was working under your supervision, what work was she doing?

A: One hundred percent inspection on blades, the same thing as she does in final, in various areas.

*       *       *       *       *

Hearing Officer: Mrs. Whitenack, Mrs. Powers was working for you, 100 percenting, I believe you said, blades? Were these finished blades, these 100 percenting?

The Witness: No, sir.

5. We further note that while the Company's time to reply to the newsletter might not have been sufficient if there had been gross and fraudulent misrepresentations, in the absence of such material the Board was within its discretion in taking into account that the Union had two months earlier identified the broad issues it intended to pursue, and that the Company had ample time to develop the factual data concerning its programs and policies for presentation to the employees. And the Company did have more than one full day after it became aware of the newsletter to prepare last minute material.

6. We are not to be taken as supporting each and every statement in the Union newsletter. We merely say the Board was well within its discretion in concluding that the newsletter was not the kind of outright, material misrepresentation which warrants overturning an election.

### B.

■ A major contention of the Company relates to the exclusion of evidence proffered that particular employees cast their ballots under the influence of newsletter representations. We agree with the Board that the inquiries as to whether union (or employer) conduct vitiates an election are properly conducted on an objective standard, without probing the mental processes and understandings of the voters, except perhaps in special circumstances such as where employees have been subjected to physical force or threats of force.[11]

### C.

■ Finally, the Company contends that a bargaining order is not appropriate when the Union involved was selected in an election held almost six years before, and there has been a substantial turnover in employees.

The time delay is unusual and vexing —reflecting principally three years in which the Board considered the Union's request for additional relief. In hindsight, the Board should have promptly ordered the bargaining as at least partial relief.

However, the critical fact is not the time delay, but the turnover.[12] As to the propriety of a bargaining order in the face of employee turnover, the authorities establish that all the courses available entail substantial disadvantages, and the Board's order lies within the zone of its discretion, with the employees able to avoid any continuing prejudice through the subsequent filing of a decertification petition.[13]

### II. *No. 24,577—Affirmative Relief*

■ In this case, the Union petitioned for review of the Board's decision not to grant special compensatory benefits

---

11. NLRB v. Gissel Packing Co., 395 U.S. 575, 608, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Although *Gissel* involves a certification based on union authorization cards, there is even greater reason to avoid an inquiry into the mental processes of how and why the employees voted as they did in the election. *Compare* NLRB v. Clearfield Cheese Co., 322 F.2d 89, 93–94 (3d Cir. 1963), upholding the finding that an employer's pre-election speech and letter to employees were coercive and rejecting its proffer of testimony by employees on the ground that it "would invite the further inquiry, in this instance, as to the direction of the witness-employees' thoughts on representation by the Union, or how he cast his vote: an inquiry destructive of the purpose of the secret ballot and creative of the spectre of post-election change of mind."

12. If the employee rolls had stayed the same, the time delay would have materiality only as opening the door to the possibility that employees changed their minds about the Union during the time period involved.

13. *See, e. g.,* NLRB v. Staub Cleaners, Inc., 418 F.2d 1086, 1089–1090 (2d Cir. 1969), cert. denied, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970), *discussing* NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), *and* NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

as a "make-whole" remedy for the period when the Company refused to bargain with the Union after it was certified.

Previously, in *Tiidee Products-I*,[14] this court held that when the Company's objections to the election were patently frivolous and its refusal to bargain with the Union when certified was a clear and flagrant violation of law, the Board had authority to grant affirmative relief in addition to a cease and desist order and was required, in consequence of the mandate of § 10(c) that the Board take such affirmative action as will effectuate the policies of the Act, to explain on what basis it justified the issuance of a cease and desist order without "make-whole" or other affirmative relief as a permissible exercise of its remedial function.

On March 19, 1971, we granted the Union's motion for summary reversal in the case at bar,[15] concluding that the Board's order denying relief was in conflict with *Tiidee Products-I*, for the following reasons:

(1) The Board, explicitly refusing to adhere to *Tiidee Products-I*, erroneously concluded that it had no statutory authority to award "make-whole" compensation.

(2) This court took account of the rule that denial of affirmative relief is appropriate where there is a debatable question. United Steelworkers v. NLRB [*Quality Rubber Mfg. Co.*], 139 U.S.App. D.C. 146, 148–149, 430 F.2d 519, 521–522 (1970). And we were aware that the Board indicated as an alternative ruling that Ex-Cell-O's violation was not flagrant. However, as we analyzed the Board's decision under review, this ruling was apparently based on the assumption that an employer seeking judicial review of an election could never be charged with a flagrant violation, in the absence of a discriminatory discharge or disregard of employees' rights other than failure to bargain with their representative. Neither the Board's Decision and Order nor the Trial Examiner's Initial Decision contained any analysis of the objections of the Company to the Union's certification. The Board stated that it could not undertake an inquiry into the issue whether the Company's objections to the election were frivolous or debatable. We disagreed and held that under *Tiidee Products-I* the Board had discretion to grant supplementary relief if the Company's objections to the election and certification were frivolous.

When we were considering the motion for summary reversal and remand of this case, the Board had presented a motion for temporary relief requiring bargaining *pendente lite*, but the record of the certification proceedings had not been filed.[16] At that stage we deemed it appropriate that the Board, which had already considered and rejected the Company's objections to the Union's certification, determine whether those objections were of a frivolous or debatable nature. We therefore remanded for further proceedings, including determinations whether Ex-Cell-O's objections to the certification were frivolous or fairly debatable, and whether "make-whole" compensation or some other affirmative remedy is appropriate.

With our arranging for expedition of consideration of the appeal by this court, the sequence of events has brought before us at an early juncture the full record of both the certification and unfair labor practice proceedings. From our study of the certification record it is

---

14. International Union of Elec. Workers v. NLRB [Tiidee Prods., Inc.—I], 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).

15. International Union, United Automobile Workers v. NLRB [Ex-Cell-O Corp.],

145 U.S.App.D.C. ——, 449 F.2d 1046, No. 24,577 (Mar. 19, 1971).

16. As it happens the Appendix containing the record was filed on March 18, the day before our printed opinions issued.

now plain that the Company's objections to the certification fall in the "fairly debatable" rather than the "frivolous" or "bad faith" category. Even "taking into account the limited ability of a court to assume as a judicial function * * * the distinctive discretion assigned to the agency," [17] we think it manifest that any proceedings by the Board on remand would result in a denial of affirmative relief.

Accordingly, while the majority of this court believes the Board erred in its analysis of the applicable legal rules, it would be a futile act to insist on a remand which could not meaningfully change the result. In this case the Board's legal error resulted in no prejudice to the Union. Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411–412, 379 F.2d 453, 465–466 (1967). While we adhere to the principles set forth in our March 19, 1971 opinion, we conclude that these principles, as applied to the record in this case, require vacating the March 19, 1971 order of remand. That order is vacated and the decision of the Board denying affirmative compensation is affirmed.

### III. Delay

One final note. In *Tiidee-I* a majority of this court was particularly concerned with the need for an effective remedy, at least in the case of an employer who fails to bargain notwithstanding an election and certification. That opinion stressed the need for a procedure and approach to remedy that obviated success for the frivolous objector,—the kind of consideration invoked by the Supreme Court in *California Department of Human Resources Development v. Java*, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). The question of how and to what extent the principles of *Tiidee* may be implemented is under consideration by the Board.

But without regard to *Tiidee,* all members of this court agree that expedition in Board determinations is desirable, especially in regard to elections. The decision to hold an election is not immediately reviewable at the instance of the employer, and while withholding of review at this stage may have some disadvantages its wisdom is attested by the consideration that in a substantial number of cases the Union loses the election, thus mooting any employer need for review. But it would be appropriate for the Board to review its procedures for those cases when the Union wins the election and the Company does not acquiesce, toward the objective of moving with expedition to identify those cases that raise no substantial problem and to enter a bargaining order, even in advance of its decision on other matters that may require further consideration.

\* \* \*

The petitions for review filed by the Union (No. 24,577) and the Company (No. 24,715) are denied. The Board's cross-application for enforcement of its order in No. 24,715 is granted.

So ordered.

MacKINNON, Circuit Judge (concurring):

The representation election here involved occurred 6½ years ago. The result was close. A switch of five votes would have changed the result. At the time of the 1964 election there were 208 employees in the bargaining unit whereas in 1970 when the Board issued its decision there were 530 employees in the unit of whom only 134 had been eligible to vote in the 1964 election. That election thus related to personnel that are no longer present and to outdated issues and a controlling majority of new employees who had no opportunity to vote will be be affected by the stale vote of a small minority. Because of the delay of the case in reaching us and the prejudicial

17. Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967), *citing* SEC v. Chenery Corp.,

332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

consequences referred to, my first preference would be to order a new election.[1] However, since my colleagues do not agree, I come to consider the company's challenge to the election. It is my view that the electioneering by the union was very close to the borderline of being prejudicial in a material degree. Some of the statements by the union were tricky distortions and overstatements of the truth and were aimed at the ignorance and gullibility of the workers and their natural desire for higher wages but they were not complete misrepresentations. The impropriety of the charges was also compounded by the timing of their release—the day before the election. I do not agree that the company had sufficient time to answer the charge and to properly disseminate their answer. However the contents of the release related to an issue which was not completely new to the pre-election campaign. Thus while I consider it particularly unworthy for one seeking to represent workers in a fiduciary capacity to indulge in such questionable tactics to secure their acquiescence, I cannot say there was not some basis in fact for the Board's determination that the statements were not such a substantial departure from the truth, or that they did not have such a substantial impact on the election, as to justify setting it aside. With these qualifications I concur in Part I of the opinion and in the result announced in Part II. I also concur in the suggestion that the extraordinarily long delay which preceded the Board's disposition of this case should call for some review by the Board of the procedures which caused it in an attempt to determine whether the consequences of delay which are here present might be alleviated in the future.

1. *See* Clark's Gamble Corporation v. N.L. R.B., 407 F.2d 199, 201 (6th Cir. 1969) where a delay of 35 months was considered sufficient for the court to remand the case to the Board to determine whether the passage of time rendered the bargaining order inappropriate.