**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DBM, INC., Respondent.**

No. 91–3729.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1992.

Decided March 5, 1993.

Harry W. Zanville, Waterloo, IA, argued, for petitioner.

Vincent Falvo, Washington, DC, argued, for respondent.

Before RICHARD S. ARNOLD, Chief Judge, LAY, Senior Circuit Judge, and LOKEN, Circuit Judge.

LOKEN, Circuit Judge.

Following a lengthy evidentiary hearing, the National Labor Relations Board concluded that respondent DBM, Inc., violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), when it retaliated against employees for their union organizing activities. The Board's cease and desist order directs DBM to reinstate and make whole four employees laid off or discharged because of their union activities, to revoke seven work rules adopted in reprisal for employees' unionizing activities, and to make employees whole for any losses suffered because of those work rule changes. The Board has petitioned for enforcement of its order. DBM resists enforcement of two aspects of that order—revocation of a work rule change that placed a 150% ceiling on DBM's weekly incentive pay system, and reinstatement of discharged employee Howard Howe. We enforce the Board's order in its entirety.

*The Incentive Pay Ceiling.*

■ DBM operates a machine shop in Cedar Falls, Iowa. In late 1988, more than half of DBM's revenues came from chipping and grinding services performed on a Pontiac block for John Deere and Company. In early January 1989, DBM announced to employees that it would reduce their piece rate on the Pontiac block from $1.45 to $1.15 to reflect a sixty cent price decrease imposed by John Deere. Dissatisfied employees contacted representatives of Local 838 of the United Auto Workers, and a union organizing campaign began with employee meetings on January 10 and 14. On January 16, 1989, the union sent an exclusive representation letter to DBM.

On January 17, DBM announced and implemented thirteen written work rules. Some of these rules reflected prior practices at the plant, but most were new restrictions or old rules that had not been enforced. The Board's administrative law judge found generally that, "no set of rules would have issued at this time but for the union activity." He then separately analyzed the nature and impact of each rule and found that seven, including the incentive rate ceiling at issue on this appeal, were unfair labor practices because they were "instituted or newly enforced for the sole purpose of intimidating the employees because of their union activities." The Board adopted the ALJ's opinion.

Prior to January 17, a line of DBM employees could earn more than the $5.00 per hour base rate if their line's average daily performance exceeded 100% of the base rate level (which in turn was based upon the Pontiac block piece rate). One of the January 17 work rules effectively placed a 150% ceiling on an employee's incentive rate. This rule was rescinded on March 13, three days after the union won the organizing election.

At the hearing, DBM attempted to justify the incentive rate ceiling as a safety rule, intended to reduce employee accidents and workers compensation insurance expense by removing any inducement for hasty, slipshod work. This experiment ended two months later, DBM explained, when it found that production had decreased and labor costs increased with no reduction in employee accidents. The ALJ found this explanation "incredible and totally unsupported." He credited employee testimony that the ceiling was presented to employees as a means to reduce their in-

come in the midst of a union organizing campaign and concluded that it was discriminatorily motivated. Our review of the record persuades us that substantial evidence supports these findings and conclusion.

DBM argues on appeal that the ALJ erred in finding that the incentive rate ceiling "seriously affected the income of employees." DBM complains that the ALJ failed to understand the incentive rate system's averaging concept and ignored convincing evidence that the 150% ceiling, as implemented, had little impact on each employee's earnings.

We agree with the Board that this economic impact argument misses the mark at this stage of the proceedings. The order under review holds that the incentive rate ceiling was unlawfully implemented in retaliation for employees' protected union activities. While it orders that DBM "make whole all employees for any losses suffered," under established Board procedures the amount of "backpay" to which any employee is entitled will be determined in a further proceeding at which the Board's General Counsel must produce the adversely affected employees, see *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 175–78 (2d Cir.1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); calculate and present "the net backpay due" for each employee, see 29 C.F.R. §§ 102.55(a);[1] and afford DBM an opportunity to rebut these claims, see 29 C.F.R. § 102.54(a). *See also Woodline Motor Freight, Inc. v. NLRB*, 972 F.2d 222 (8th Cir.1992).

Since there was substantial evidence supporting the Board's decision that the incentive rate ceiling was discriminatorily motivated, this portion of its order must be enforced. We leave the quantification of the adverse effect of this work change on DBM's employees to such further back pay proceedings as the Board may in its discretion conduct.

*Howe's Discharge.*

Howard Howe worked on a DBM chipping and grinding line and was a known union supporter. On Friday February 16, 1989, Howe's supervisor told him that he was needed for overtime that weekend because an air compressor was down and the critical Pontiac block work was behind schedule. Howe objected that he could not work overtime because he had made plans with his wife to celebrate their wedding anniversary in Des Moines. At the supervisor's suggestion, Howe repeated this to DBM's president Douglas McCalley, who said that DBM "could really use" Howe's overtime help. According to Howe, he was not told the overtime was mandatory nor threatened with discipline if he did not work.

Howe did not work the Saturday overtime. He was discharged when he returned for his next regular shift that Sunday. A few days later Howe visited the plant and asked McCalley for reinstatement; McCalley replied that he would like to rehire Howe but could not do so because of the union negotiations. The union election was scheduled for March 10.

In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court upheld the Board's approach to discriminatory discharge issues: the Board's General Counsel has the burden of proving that an employee's protected union activity was a substantial or motivating factor in the employer's decision to discharge. If that is proven, the employer may still avoid liability in a mixed motives case by proving that the employee would have been discharged in any event for wholly permissible reasons. In this case, the ALJ concluded that Howe's protected union activity was a motivating factor in his discharge and expressly rejected DBM's contention that he would have been fired anyway:

But for the fact that Howe was a known union adherent who would cer-

---

**1.** In this regard, because the Board found that the 30 cent piece rate reduction on the Pontiac block was adopted before the January 17 work rule changes and was *not* motivated by anti-

union animus, the amount of income lost on account of the 150% incentive rate ceiling must be based upon the reduced $1.15 piece rate.

tainly cast his ballot for the Union, Respondent would not have discharged him for celebrating his wedding anniversary rather than working one shift of overtime.

 DBM attacks the Board's unfair labor practice decision under both prongs of the *Transportation Management* standard. First, DBM argues that there is no substantial evidence supporting the Board's conclusion that Howe was discharged for his union activities. Howe was a union supporter but not a union leader. His pro-union sentiment was obvious to DBM after the January 14 organizing meeting, yet DBM only suspended him for an earlier transgression, when he failed to show up for work on February 1. Since it was obvious when Howe was discharged that the union would win the March 10 election, DBM argues, the record does not support the ALJ's finding that Howe's protected union activity was a factor in the decision to discharge him.

Second, DBM argues that the Board erred in rejecting DBM's affirmative defense that Howe would have been discharged anyway for refusing to work the mandatory overtime. DBM asserts that Howe's misfeasance was serious—he was the only employee who failed to report for mandatory overtime occasioned by a major equipment breakdown during a financially troubled period for the company. Therefore, the ALJ improperly substituted his judgment for that of management when he concluded that this misconduct was not sufficiently serious to warrant termination.

Having carefully reviewed the administrative record, we conclude that substantial evidence supports the Board's decision that Howe was wrongfully discharged. DBM's argument focuses only on Howe's situation, ignoring the company's many other unfair labor practices during this period. However, these other unfair labor practices are highly relevant, since "[i]nference of an employer's unlawful motive [toward an employee] may be drawn from the employer's hostility toward the union." *Hall v. NLRB*, 941 F.2d 684, 688 (8th Cir.1991). In addition, we agree with the ALJ that the circumstances surrounding Howe's discharge smack of pretext. Howe explained his scheduling conflict to DBM's president before the requested overtime began. McCalley encouraged Howe to help out but did not tell him that the overtime was mandatory or that he would be disciplined for not working. *See NLRB v. Broyhill Co.*, 514 F.2d 655, 659–60 (8th Cir.1975). After Howe's summary discharge, he asked for his job back and was told that "the union negotiations" stood in the way of reinstatement. Given DBM's demonstrated anti-union animus, there is plainly substantial evidence supporting the Board's conclusion that Howe's discharge was an unfair labor practice. *See NLRB v. Senftner Volkswagen Corp.*, 681 F.2d 557, 559–60 (8th Cir.1982).

The Board's application for enforcement of its order of September 27, 1991, is granted.