# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 98-1631

———————

National Labor Relations Board,          *
                                         *
          Petitioner,                    *
                                         *
     v.                                  *     Application for Enforcement
                                         *
MDI Commercial Services,                 *
                                         *
          Respondent.                    *

———————

Submitted:  November 16, 1998

Filed:   April 21, 1999

———————

Before BEAM, LAY, and LOKEN, Circuit Judges.

———————

LOKEN, Circuit Judge.

The National Labor Relations Board (the "Board") seeks to enforce its cease and desist order against MDI Commercial Services, Inc. ("MDI"), for violations of §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). The dispute arose after an unsuccessful organizing campaign by the International Brotherhood of Electrical Workers (the "Union") at MDI's plant in Grand Rapids, Minnesota.  Adopting the recommendations of its Administrative Law Judge with one change in legal theory, the Board ruled that MDI committed unfair labor practices by restraining and coercing employees prior to the union election in December 1994; by

discharging four employees because of their pro-union activities; and by delaying the recall of ten union sympathizers after a shortage of work caused severe layoffs in January 1995. We enforce the Board's order except as to two of the recalled employees, Douglas Jaeger and LaVonne MacAdams, and two of the discharged employees, Regina and Edward Saric.

## I. Election and Post-Election Issues.

MDI's parent is a non-profit corporation that employs disabled and other disadvantaged workers. MDI was formed in early 1994 to build a plant in Grand Rapids funded by a grant from a large local employer. When the United States Postal Service elected not to contract out work the Grand Rapids plant had hoped to perform, MDI was left to find assembly, packaging, and other projects for its new plant in the private sector. During the time in question (the fall of 1994 through the spring of 1995), the Grand Rapids plant was in precarious financial condition, incurring on-going losses that resulted in major employee layoffs in September 1994 and January 1995.

After the Union began its organizing campaign, supporters arranged meetings and wore union buttons and emblems at work. MDI's President, James Maher, repeatedly traveled from the Twin Cities to Grand Rapids to encourage employees not to support the Union. The plant's supervisors, though instructed by MDI not to pressure employees on the union issue, engaged in conduct the Board later found coercive. The Union petitioned the Board for an election. It was held on December 16, and the Union lost, 53 to 20. Due to a downturn in business, MDI temporarily laid off most employees on January 18, 1995. Union supporters Keith Hawkinson and Ricky Thayer were permanently laid off. Business improved, and by March 1995 all but thirteen of the other employees had been recalled. MDI recalled the last thirteen in late April; ten were active union supporters. The Union then filed its unfair labor practice charges.

The Board concluded that MDI engaged in coercive and improper tactics prior to the December 1994 election, and then discriminated and retaliated against union supporters by permanently discharging Hawkinson and Thayer in January 1995, and by delaying its recall of ten union supporters until late April. MDI does not contest the findings and conclusions that it committed unfair labor practices prior to the election -- for example, by telling employees a raise was not feasible because of the Union's campaign, by questioning employees about their support of the Union, by monitoring a Union-sponsored dinner meeting and reprimanding union supporters just before the election, and by warning employees that MDI's owner hated unions and would close the plant if the Union won. We summarily enforce these portions of the Board's order and consider the Board's uncontested findings of anti-union animus in reviewing the contested portions of its order. See Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1381-82 (8th Cir. 1993).

Turning to post-election events, the Board's General Counsel did not contest MDI's economic decision to lay off most employees in January 1995. However, he did challenge the permanent layoffs of Hawkinson and Thayer and the late recall of ten employees who supported the Union in the December 1994 election. The ALJ found that these employment actions violated §§ 8(a)(1) and (3)[1] because they were motivated by a desire to retaliate against union supporters and to discourage further attempts to secure union representation. The Board agreed.

On appeal, MDI argues these portions of the Board's order should not be enforced because they are not supported by substantial evidence on the record as a whole, the standard of review prescribed in 29 U.S.C. § 160(e). See generally

---

[1]Under § 8(a)(1), it is an unfair labor practice "to interfere with, restrain, or coerce employees" in their exercise of protected rights. Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Pace Indus., Inc. v. NLRB, 118 F.3d 585, 590 (8th Cir. 1997), cert. denied, 118 S. Ct. 1299 (1998). "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion[s]." Allentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 823 (1998). In deciding wrongful discharge and layoff issues of this kind, the Board's General Counsel has the burden of proving that an employee's protected activity was a motivating factor in the employer's adverse employment action. If the General Counsel meets this burden, the conduct is unlawful unless the employer proves it would have taken the same action absent the protected activity. See NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 401-03 (1983); NLRB v. DBM, Inc., 987 F.2d 540, 542-43 (8th Cir. 1993).[2]

The Board concluded the General Counsel met his burden of proving these employees' protected activities were a motivating factor in the terminations and late recalls. There is substantial record evidence supporting this conclusion. First, and most importantly, the uncontested pre-election unfair labor practices provided evidence of union hostility. Second, as MDI concedes, all twelve employees had been open and active union supporters prior to the election, so any lingering anti-union animus would logically have been directed at them. Third, because the Union won only 20 of 73 votes in the election, it is not likely a coincidence when ten of the last thirteen employees to be recalled were union supporters. From this evidence, the Board could reasonably infer that MDI's hostility to unions and desire to discourage future

---

[2]As these cases make clear, proof that the employer would have taken the same action in any event is an affirmative defense *to liability* articulated by the Board in Wright Line, 251 N.L.R.B. 1083 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982). The dissent nonetheless contends that issues relating to Douglas Jaeger and LaVonne MacAdams should be left for the Board's back pay remedy proceeding. This contention is squarely contrary to the law as developed by the Board in Wright Line and approved by this court and by the Supreme Court.

organizing activity were motivating factors in the adverse employment actions. See DBM, 987 F.2d at 543; Ballou Brick Co. v. NLRB, 798 F.2d 339, 342 (8th Cir. 1986).

In its defense, MDI presented evidence that Thayer and Hawkinson were selected for permanent layoff because of their excessive lateness, absenteeism, and low productivity. Turning to the late recall of ten other union supporters, MDI presented evidence that as business rebounded in early 1995, it recalled workers best suited to the projects on hand, typically those familiar with the types of work then available. MDI witnesses also pointed to specific performance deficiencies and physical disabilities of the ten employees, and explained that MDI first recalled its most productive employees regardless of their Union support. In rebuttal, the General Counsel presented detailed evidence that MDI had no fixed practice of disciplining employees for lateness or absenteeism; that MDI has a history of tolerating performance deficiencies, particularly from its disabled employees; that employees recalled earlier were no more productive; that many new employees were hired before the ten union supporters were recalled; and that management reports contradicted MDI's "familiar work" explanation. The evidence on these issues was conflicting, and we may not preempt "the Board's choice between two fairly conflicting views" of that evidence. Universal Camera, 340 U.S. at 488. After careful review of the record as a whole, we conclude, with two exceptions, that substantial evidence supports the Board's decision that MDI failed to prove it would have permanently laid off Hawkinson and Thayer and would have delayed recalling the other ten absent its anti-union animus. See United Exposition Serv. Co. v. NLRB, 945 F.2d 1057, 1060 (8th Cir. 1991); Hall v. NLRB, 941 F.2d 684, 688-89 (8th Cir. 1991); York Prods., Inc. v. NLRB, 881 F.2d 542, 545-46 (8th Cir. 1989).

The two exceptions are late-recalled employees Douglas Jaeger and LaVonne MacAdams. MDI presented evidence that the late recall of these employees was due to specific physical disabilities, not simply low productivity or poor work performance. Jaeger suffered a stroke that allowed him to use only one hand and made it difficult for

him to stay awake during work hours. The Grand Rapids plant manager, Lorraine Bunn, testified that MDI was not able to configure a work station for Jaeger and provide him needed on-the-job assistance until late April. Jaeger did not testify, and the General Counsel introduced no evidence rebutting this testimony. MacAdams injured her thumb at work in December 1994. When the thumb did not heal, she claimed workers compensation benefits from MDI in early March. MDI presented documentary evidence MacAdams was not released for work by her treating physician until the day she was recalled, April 25, 1995. Though MacAdams testified about other subjects during the General Counsel's case-in-chief, she was not recalled to rebut this evidence.

The ALJ did not address whether Jaeger was physically qualified for earlier recall, except to note MDI always intended to recall him. As to MacAdams, the ALJ noted a handwritten entry on a medical release form that her disability period was "14 Apr to 24 Apr" and construed that as meaning she could have been recalled before April 14. That is rank speculation, and it conflicts with the undisputed evidence that MacAdams came to MDI in early March with her claim for treatment of a disabling condition. Obviously, Jaeger and MacAdams were the persons most able to rebut MDI's evidence that physical and medical reasons precluded their earlier recall. The Board erred in not drawing an adverse inference from the General Counsel's failure to present testimony by the alleged discriminatees on those issues. See Rockingham Machine-Lunex Co., 665 F.2d 303, 304-05 (8th Cir. 1981), cert. denied, 457 U.S. 1107 (1982). In these circumstances, we conclude substantial evidence does not support the Board's rejection of MDI's affirmative defense that it would not have recalled Jaeger and MacAdams any sooner absent its anti-union animus. See GSX Corp. of Mo. v. NLRB, 918 F.2d 1351, 1360 (8th Cir. 1990).

## II. The Terminations of Regina and Edward Saric.

Edward Saric was one of the first employees hired for MDI's new Grand Rapids plant. His duties included opening and closing the plant, shipping and receiving, plant maintenance, and building tools and fixtures to assist disabled workers. Shortly after the plant opened, his wife Regina was hired as a production worker and soon became administrative assistant to plant manager Bunn. The Sarics were included in meetings of the plant's management team and were put in charge of the plant when Bunn and the production supervisors were out of town. However, by the fall of 1994, the Sarics were dissatisfied with their compensation, and Edward was upset that others were sometimes asked to perform some of his duties. The Sarics signed union authorization cards but were not active Union organizers.

On Monday, October 31, 1994, manager Bunn returned to the plant after a business trip to find employees upset because Regina Saric had distributed a Material Safety Data Sheet ("MSDS") that caused employees to fear OSHA was about to close the plant, when in fact OSHA had inspected MDI's use of the packaging material in question and considered it safe. Bunn angrily reprimanded Regina for disseminating the MSDS in this manner. Regina then left the plant. After she left, Bunn met with Edward Saric and asked him to give her the keys to the plant. Upset, Edward phoned Regina from Bunn's office to get a ride home. Bunn asked Edward if he was quitting. Edward responded he "might as well" and signed a voluntary termination form. After Edward left the plant, Bunn told employees Edward quit and Regina walked out. The next day, neither Saric came to work, and MDI mailed their final paychecks and posted their positions as vacant. The Board concluded MDI violated §§ 8(a)(1) and (3) by firing Regina and Edward for their support of the Union. MDI argues we should not enforce those portions of the Board's order. We will consider the Sarics separately because their termination issues are somewhat different.

**A. Regina Saric.** After her unpleasant meeting with Bunn regarding distribution of the MSDS sheet, Regina Saric left the Grand Rapids plant and never returned. She later applied for unemployment compensation benefits, claiming she was discharged, and testified at a contested hearing. The Minnesota Department of Economic Security denied her claim:

> We conclude, in the present case, that [Regina] was the moving party. She left work on October 31, 1994 after being reprimanded by her supervisor. She was not told that she was "fired" and she did not say that she quit. [Regina] testified that she intended to leave the job site in order to give her supervisor an opportunity to "cool off." [Regina] stated that she intended to later return to work. However, later that day she was informed that her husband had been "forced to quit." In addition, she also was informed that her supervisor had informed other employees that [she] and her husband "were gone."

> However, the evidence shows that [Regina] walked off the job without notice to [MDI]. [MDI] had work available for [Regina] and she was scheduled to work on November 1, 1994. [Regina] did not call her supervisor or any other person in management to discuss her job. Later [Regina] received a letter from [MDI] which stated that [Regina] had resigned from her position. She did not contact [MDI] to indicate that she was not resigning.

> We conclude that [Regina] made a "free-will choice" not to return to work for [MDI]. . . . [Regina] did not have a reasonable basis to believe that she had been fired. . . . [A] reasonable employee in those circumstances would have at least contacted [MDI] to determine his or her job status.

Regina E. Saric v. Minnesota Diversified, No. 1147 UC 95, at 4 (Mn. Dept. Econ. Sec. Jun. 30, 1995). At the Board's hearing, Bunn testified consistently with the above-quoted portions of the unemployment compensation decision. *Regina Saric did not testify*. Edward testified that he told Bunn Regina had gone home with a headache.

Resolving all credibility issues against MDI and ignoring the unemployment compensation decision altogether, the ALJ ruled "the credible evidence leaves little room for a conclusion other than that Regina Saric had been fired." Then, relying on subsequent anti-union statements of a low-level supervisor who had nothing to do with Regina's departure, the ALJ found she was discharged because of MDI's "suspicion that Ms. Saric had been supporting the Union." The Board summarily affirmed these findings. We decline to enforce this portion of its order.

To prove a wrongful discharge, it is not essential that the employee be formally fired, but it is necessary to prove that "the words or action of the employer would logically lead a prudent person to believe his tenure had been terminated." NLRB v. Hale Mfg. Co., 570 F.2d 705, 708 (8th Cir. 1978) (quotation omitted). Here, the only relevant document was a memorandum sent to Regina with her final paycheck stating that she had resigned. To prove Regina was fired in the face of this evidence she quit, her own testimony was indispensable. The General Counsel had to prove that manager Bunn gave Regina reason to believe she had been fired. That required full exploration of the October 31 confrontation between Bunn and Regina, and its aftermath. Without Regina's testimony, the record contains no satisfactory answer to questions such as what Bunn said on October 31 to make Regina think she had been fired, why she went home, what personal belongings she took with her, what the Sarics discussed after Edward left the plant later that day, why Regina did not go to work on November 1, and why she did not immediately challenge MDI's memorandum stating she had quit.

Regina Saric, an alleged discriminatee, was a potential witness within the General Counsel's control. The failure of a charging party to testify requires an inference that her testimony would have been unfavorable to the General Counsel's case. See Rockingham, 665 F.2d at 304-05; International Union, UAW v. NLRB, 459 F.2d 1329, 1335-40 (D.C. Cir. 1972); Meier v. Commissioner, 199 F.2d 392, 396 (8th Cir. 1952). Here, we have more than an adverse inference that Regina's testimony

would not have supported the General Counsel's theory. Regina testified in the state unemployment compensation proceedings, and her testimony was a basis for the Department's decision that she had quit. Of course, the Board is not required to follow the decision of a state unemployment compensation agency. But the testimony of MDI's witnesses was consistent with that decision, and Regina -- the witness most critical to proving a contrary position -- failed to appear. "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939).[3]

In these circumstances, we have no difficulty concluding that substantial evidence on the record as a whole does *not* support the Board's finding that Regina Saric was discharged. The Board "must draw all inferences that the evidence fairly demands." Allentown Mack, 118 S. Ct. at 829. It erred in ignoring Regina's failure to testify. We decline to enforce this portion of the Board's order.

---

[3]The dissent's suggestion that no adverse inference may be drawn because Regina Saric was equally available to both parties flies in the face of reality. As the Second Circuit said many years ago in only a slightly different context:

> [W]hile the Board correctly argues that its primary concern is the public interest in promoting full production and employment by means of the back pay remedy, it is nevertheless the representative of the discriminatees. If the discriminatees had to sue in their own right for back pay, they would obviously have to testify and be cross-examined. Since the Board presumably has some prior contact with available discriminatees . . . it is more likely to know their whereabouts at the time of the hearing. We think it fair to require that the Board make them available.

NLRB v. Mastro Plastics Corp., 354 F.2d 170, 177 (2d Cir. 1965), cert. denied, 384 U.S. (1966). See also Tyler v. White, 811 F.2d 1204, 1207 (8th Cir. 1987).

**B. Edward Saric.** The critical event relating to Edward's departure from MDI was his meeting with plant manager Bunn on the morning of October 31, after Regina left the plant. Edward Saric did testify at the Board's hearing, and both he and Bunn described this meeting in detail. As the Board resolved all credibility issues in Edward's favor, we set forth the portion of his testimony quoted in the Board's opinion:

> QUESTION (By General Counsel): . . . . So let me ask you a little bit about what happened on your last day of work. . . . Why don't you go through the day with me?

> \* \* \* \* \*

> ANSWER: And so I went into the office, sat down and Lorraine just started about this union, what is going on, what are you two up to, all this union crap. She won't tolerate any union activities. She just didn't want to hear about it. . . . So I said I don't know anything about [the] union. I don't want to jeopardize anything and she asked for the keys of the building from me. I said, "Why would you need my keys?" She said, "Well," she said, she can't trust me with my work anymore. She needs somebody responsible for--to do these duties and I was real surprised because nobody ever had any complaints about my work. Nobody ever said anything that I did wrong or anything to that matter.

> \* \* \* \* \*

> QUESTION: . . . . So she asked for your keys back and then did you give her your keys back?

> ANSWER: Yeah. I gave her my keys. I had a set of keys on my keychain. I gave her that and some other keys were in my locker so I went back to take those keys and I gave her back everything, and I asked her to use the phone to call my wife because we drive to work in [the] same vehicle and she left earlier. So I called my wife and told her to come and pick me up because I didn't have a way to get home, and after I finished the conversation Lorraine was in the other office, opened [the] door and she just said "So you are quitting?" Those were her words.

-11-

I said, "Well, I needed a ride home and," I said "you took my duties away, my keys." I said "What else is there for me." I said "Yeah, I might as well. I'll quit." And she already had some paper there that she gave me to sign and said that's just a formality or something, and I was just angry and disappointed in the way she acted and the anger and I just signed the paper and I walked out.

QUESTION: Okay. Why did you call your wife after she--after Lorraine Bunn asked for your keys back and you said you went in and called your wife to pick you up. Why did you do that?

ANSWER: Well, after she took my keys away and I believe the rest of my duties--those were one of the main duties that I had. I believed I had no work there even though she didn't say it yet but I just believed there was nothing else for me so I would go home for that day at least just to let her cool down and see what will happen tomorrow morning.

Rejecting the ALJ's conclusion Edward Saric was constructively discharged, the Board concluded he was "effectively discharged." But this theory is *directly contrary to Edward's testimony*. According to Edward, Bunn never brought up the subject of termination until he called his wife for a ride home during working hours. When Bunn asked if he was quitting, Edward said yes and signed a resignation form. On cross examination, Edward testified he left the plant and never contacted MDI again except to ask for his unpaid vacation pay:

Q. And on November 1st you decided not to go in to work, true?

A. Well, if this says that I resigned I don't see the reason why I have to go back.

[The ALJ]: All right. So on November 1 you did decide not to go in to work, right?

THE WITNESS: I had no reason to go to work.

\*     \*     \*     \*     \*

Q. And you did contact MDI later that week and request payment for your vacation time, true?

Q. Yeah. I just wanted to make sure I'll get paid for what I deserve.

Three other factors also make the Board's conclusion unpersuasive. First, the ALJ and the Board both emphasized that Edward told Bunn Regina left early with a headache, to which Bunn responded, "Well, that's an unexcused absence. That's good." The Board construed Bunn's reference to "unexcused absence" as evidence she was looking for a pretext to fire Regina, and also found in the comment a hostile backdrop for Bunn's later conversation with Edward. But the ALJ misquoted this portion of the transcript. Edward in fact testified, "Lorraine said 'Well, that's an *excused* absence. That's good.'" The actual testimony supports inferences contrary to the Board's -- Bunn was pleased Regina had a legitimate reason to leave the plant ("an excused absence") and would not need to be disciplined, which in turns suggests Bunn did not think she had fired Regina and was not about to discharge Edward.

Second, on the question whether Edward Saric quit or was fired, the testimony of Regina Saric would have been highly relevant. In his above-quoted testimony, Edward was inconsistent, saying both that he quit, and that he went home to let Bunn cool off. If Edward quit, he was not discharged; if he went home with the intention of returning to work the next day, then something happened to change his mind. Regina Saric had first hand knowledge on this question. Applying the adverse inference rule, which requires an assumption that the missing testimony would not have favored the General Counsel's case, it is reasonable to infer that the Sarics talked after they left the

-13-

plant and decided not to return to MDI because their pay was too low, Edward's job duties were being reduced, and they had been unfairly abused by plant manager Bunn.

Third, the Board placed great emphasis on Edward's testimony Bunn told him she would not tolerate any "union crap."[4] Bunn denied this. The Board credited Edward's testimony, as it was entitled to do, but in placing Bunn's union remarks in the worst possible light for MDI, the Board disregarded the relevance of other undisputed testimony. Numerous MDI witnesses testified that MDI considered Edward Saric a supervisor. The Board rejected MDI's legal defense that Saric was an exempt supervisor -- that is not an issue on appeal. But the Board inexplicably ignored the factual significance of this testimony. Bunn knew MDI supervisors should avoid being involved in the Union's organizing campaign. Viewed in that light, her concern over rumors that Edward Saric was involved is hardly sinister. On October 31, six weeks before the election was eventually held, Bunn's inquiry as to Edward's possible union activity simply will not bear the weight the Board gave it.

In considering whether substantial evidence supports the Board's decision, we must take into account "whatever in the record fairly detracts from its weight." Universal Camera, 340 U.S. at 488. The Board may reject MDI's reasons but may not "irrationally disregard" evidence supporting MDI's position. See Allentown Mack, 118 S. Ct. at 824-25. Viewing the record as a whole as it relates to the events of October 31 and November 1, 1994, we conclude the Board's decision that Edward Saric was discharged reflects "a complete disregard for sworn testimony," particularly the contrary testimony of Edward himself, reinforced by the missing testimony of Regina. Banner Biscuit Co. v. NLRB, 356 F.2d 765, 768 (8th Cir. 1966). By Edward's own admission, he quit before he had any reasonable basis for believing that Bunn was about either to discharge him or to take away substantially all of his job duties. Whether Edward quit because he was upset that Bunn asked about his union activity, or for some other reason,

_____

[4]Edward admitted Bunn also said she could work with or without a union, "she just didn't care."

-14-

MDI did not discharge him.  We decline to enforce the Board's decision to the contrary.

### III. Conclusion.

The Board asks us to enforce the Order adopted in its decision of November 8, 1997.  For the foregoing reasons, we modify paragraphs 1(b), 2(a), 2(b), and 2(c) of the Order, and the Notice to Employees contained in the Appendix to that Order, to delete all references to Douglas Jaeger, LaVonne MacAdams, Regina Saric, and Edward Saric. As so modified, the Order is enforced.  See 29 U.S.C. § 160(e).  The parties should attempt to agree upon a modified form of Notice to Employees that is consistent with this opinion.  If they cannot agree, the Board may file a motion with this court for approval of its modified Notice to Employees.

LAY, Circuit Judge, concurring and dissenting.

I concur in the majority's ruling insofar as it affirms the Board's decision finding that MDI violated §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3).  I conclude that the majority errs, however, in reversing the Board's finding that Regina and Edward Saric were unlawfully discharged.  I respectfully submit that the majority slights critical evidence supporting the Board's finding that both Regina and Edward were unlawfully discharged by reason of their union activities.  I also dissent from the majority's opinion that the late-recalled employees, Douglas Jaeger and LaVonne MacAdams, are not entitled to a finding of discrimination against them because of their union activities, along with the other later-recalled employees.

Regina Saric

Upon thorough review of the record, I find that substantial evidence supports the Board's conclusion that Regina Saric was unlawfully discharged.  First, it is important

-15-

to consider the background of MDI's open hostility toward the union and the organizing campaign carried on by some of its employees. These hostile activities were relied upon by the Board in making its determinations and were recognized by the majority as well. Second, the evidence shows that on October 28, 1994, the day that MDI received the union's petition for an election, two supervisors told Lorraine Bunn, the plant manager, that the Sarics were urging employees to sign union authorization cards. That same day Regina distributed copies of a material safety date sheet (MSDS) which an inspector had directed MDI to disseminate. The next day Bunn criticized Regina for distributing the safety sheet. Regina subsequently told her husband that Bunn was "harassing her" and that she was going home because she had a "big headache." Bunn inconsistently testified about the belongings that Regina took home with her that day – originally claiming that Regina brought only her purse and jacket, and later claiming that all of her belongings were gone. Russell Catlett, a supervisor at the plant, also gave inconsistent testimony regarding this subject.[5] The Board concluded that the inconsistent testimony of Bunn and Catlett regarding the possessions Regina brought with her "appeared to have been more intended to support [MDI's] contention that Regina Saric had quit, than to truthfully describe what had taken place when she left work that day."

Later that day, Bunn told Edward Saric that she knew that both he and his wife, Regina, were union sympathizers and that she would not "tolerate" any "union crap." Bunn then called a meeting and told others that Regina had walked off the job. On

---

[5]On direct examination, Catlett stated that he saw Regina leave with a box of her belongings. Later, on cross-examination, he admitted that Regina had her back to him and he did not know what she was carrying when she left the office.

November 1, 1994, Bunn posted a written description of Regina's job so other employees could apply for it. Thomas Manthey, another employee at the plant, testified that Bunn acknowledged to him that Regina had been <u>fired</u>. Manthey also testified that several days later Catlett said "that's what you get when you mess with the [U]nion. You end up like [Regina Saric]."

The majority's acceptance of Bunn's assumption that Regina voluntarily quit her job because she went home complaining of a headache is unreasonable. The majority credits Bunn as saying that Regina's absence was "excused." Yet Bunn immediately posted Regina Saric's job as an open position. It is difficult for me to say that a reasonable fact-finder could not conclude from this evidence that Regina had been fired.

This court should not substitute its judgment for that of the ALJ and the Board, the fact-finders in this case. Credibility findings are within the province of the Board and the ALJ found Bunn not to be credible. It is not this court's role to reverse that determination. Our role is solely to review the record to see if there is substantial evidence as a whole to support the Board's finding. <u>See Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951). There is evidence in this case, including admissions by Bunn and Catlett, which clearly supports the Board's finding that Regina had been fired.[6]

---

[6]The majority's reliance on the finding of the unemployment compensation panel is totally irrelevant. It is clearly not binding on the Board. The Board, through the ALJ, must rely on the record developed at its own hearing. Even if the panel's finding could be properly considered, it has no bearing in this case because the panel presumably did not consider the anti-union animus by company officials leading up to Regina's termination.

Edward Saric

The same evidence regarding MDI's illegal motive supports the Board's finding that Edward Saric was wrongfully discharged. After Bunn admonished Edward about supporting the union, she told him to turn in his keys, stating that she could no longer trust him and that she feared for building safety. As a result, there is little question that Edward considered himself "fired." In fact, immediately after his conversation with Bunn, Edward told his supervisor that he had been fired. Furthermore, the majority again fails to acknowledge the admissions of Bunn and Catlett that Edward had been fired. In light of this proof, it is somewhat incredulous to say that substantial evidence does not support the Board's finding.

Absent Witness Rule

The majority opinion applies the absent witness rule in both the Regina and the Edward Saric cases because Regina did not testify. The absent witness rule, which finds its origins in the common law, allows an adverse inference to be drawn from the failure of a witness, who is within control of an adverse party, to appear at trial and testify. Meier v. Commissioner, 199 F.2d 392, 396 (8th Cir. 1952). This inference is weighed against the party who controls the witness.

This court has indicated that the absent witness rule should not apply where the witness is equally available to both parties. See Mammoth Oil Co. v. United States, 275 U.S. 13, 52 (1927) (holding that the absent witness rule is to be applied "only in cases where it is manifest that proofs are in the power of the accused, not accessible to the prosecution") (citation omitted); see also Schoenberg v. Commissioner, 302 F.2d 416, 420 (8th Cir. 1962); Johnson v. United States, 291 F.2d 150, 155 (8th Cir. 1961). In Jenkins v. Bierschenk, 333 F.2d 421 (8th Cir. 1964), this court relied on Schoenberg, stating:

> "We have serious doubt whether in a situation such as is presented here, where the witness was apparently equally available to both parties, any presumption should flow from the failure of either party to call such witness. Any rule creating a presumption from failure to produce a witness must be applied with caution."
>
> There is nothing which indicates that [the witness] was not equally available as a witness to both the plaintiff and the defendants.

Jenkins, 333 F.2d at 425(quoting Schoenberg, 302 F.2d at 420).

The Supreme Court has also held that this rule is to be applied with caution. See Mammoth Oil Co., 275 U.S. at 52. As the court in Jenkins observed:

> We adhere to our comment that any rule creating a presumption of this kind is to be applied with caution and we agree with the trial court that "there must be a reason for such a supposition, and a factual area within which it may logically operate. The supposition must rise above the level of mere possibility."

Jenkins, 333 F.2d at 425.

The adverse inference the majority applied against Regina and Edward as a result of Regina's decision not to testify should not have been used against them. The inference is especially inappropriate in Edward's case. The majority states that "it is reasonable to infer that the Sarics talked after they left the plant and decided not to return to MDI because their pay was too low, Edward's job duties were being reduced, and they had been unfairly abused by plant manager Bunn." This is simply rank speculation. Even assuming that Regina did talk with Edward about whether or not he

-19-

was fired, any question as to what her husband told her would have called for hearsay.[7]

---

[7]There is also the possibility that Regina's right not to testify would have been protected by the marital communications privilege which bars testimony concerning statements privately communicated between spouses.  See United States v. Jackson, 939 F.2d 625, 627 (8th Cir. 1991);  United States v. Ramos-Oseguera, 120 F.3d 1028, 1042 (9th Cir. 1997), cert. denied, 118 S. Ct. 1094 (1998) (stating that federal common law recognizes two different marital privileges).

The conclusion ineluctably follows that the use of the adverse witness rule in Edward's case is totally inappropriate.

Likewise, the rule does not apply to Regina's case. First, Regina was equally available as a witness to both MDI and the Board. MDI could have subpoenaed Regina to testify and called her as a hostile witness. There was no explanation as to why this was not done. Furthermore, there exists no claim that the Board was guilty of concealing her. Second, all the facts and circumstances surrounding Regina's termination were proven by the NLRB and MDI. The only evidence that could be gained through Regina's testimony would have been cumulative, as well as self-serving and conclusory.

Notwithstanding the cumulative concerns expressed, the fundamental flaw in the majority's reasoning that the adverse inference rule should be applied is that it overlooks the fact that the inference is solely within the Board's power, as the fact-finder, to draw. See NLRB v. Link-Belt Co., 311 U.S. 584, 597 (1941); NLRB v. Falk Corp., 308 U.S. 453, 461 (1940). Assuming the inference was appropriate, which it clearly was not, it is within the sole prerogative of the trial court to draw the inference. In the present case, the ALJ did not draw the inference and there is no basis for this court to rely upon such an inference in reviewing the administrative record. In making such an inference, the majority wrongfully usurps the role of the trier of fact.

In sum, the evidence overwhelmingly supports sustaining the Board's findings with respect to Edward and Regina Saric. The undisputed evidence shows (1) that there was anti-union sentiment at MDI and it was expressed to both Edward and

Regina; (2) that Bunn took Edward's keys and relieved him of his duties; (3) that Bunn immediately posted the opening of Regina's job; and (4) that Bunn and Catlett both admitted that Regina and Edward had been fired. All of this evidence substantially supports the ALJ's and the Board's hypothesis: Edward and Regina were fired because of their union activities.

Douglas Jaeger and LaVonne MacAdams

The Board found that the General Counsel met the burden of proving that the union sympathies and activities of the ten late-recalled employees had been a substantial or motivating cause of MDI's decision to delay their recall. The majority agrees that there is substantial evidence to support the conclusion that MDI's anti-union animus caused the late-recall of the employees. The majority, however, makes two exceptions for Douglas Jaeger and LaVonne MacAdams. I respectfully disagree with the majority's decision to single out these two employees and deny MDI's liability with respect to them. If MDI is guilty of a section 8(a)(3) violation as to the late recall of the entire group, there is no evidence the same anti-union animus did not enter into the late recall of Jaeger and MacAdams. It is nonsensical to hold otherwise.

MDI advances a variety of explanations for why each individual was not promptly recalled. The majority singles out Jaeger and MacAdams because they have "specific physical disabilities." Jaeger suffered from a stroke and needed an assistant, while MacAdams injured her thumb and claimed workers' compensation benefits in March. The majority concludes that these disabilities precluded them from being recalled any earlier than April. I disagree for four reasons.

First, as the majority recognized, the Board properly found that MDI's anti-union animus caused the delayed recall of the employees. I see no reason why Jaeger and MacAdams should not equally benefit from this finding. Second, these two individuals are not the only two out of the ten employees at issue who were disabled: Parker had

a "small motor disability;" Thompson suffered from back spasms; and Younger was confined to a wheelchair. In fact, MDI made it a goal to employ disabled employees. There is no reason that Jaeger and MacAdams should be singled out by the majority for their disabilities.

Third, although there is some ambiguity surrounding the doctor's orders concerning MacAdams' ability to work, the Board did not attempt to pass on that matter, but decided that the date MacAdams was able to work was an issue properly left for the compliance hearing. See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 902 (1984); NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 260 (1969). I agree. Due to her union sympathies, MacAdams should be treated like the other late-recalled employees and receive the benefit of the overall finding of the ALJ, which the Board and the majority sustained, that the late recall stemmed from anti-union animus. Any ambiguity as to the date MacAdams could commence employment should be left for a compliance hearing.

This logic applies to Jaeger as well. MDI claimed that Jaeger's recall was not delayed due to anti-union sentiment, but rather, because they could not find an assistant for him until April. The majority accepted this defense. I disagree and conclude that Jaeger also should benefit from the finding that MDI's late recall of the ten employees was due to their union activities. The determination of the date that Jaeger could work with assistance should be reserved for the compliance hearing because it is a question of damages and not liability.

Finally, the majority also applied the adverse inference rule previously discussed to defeat Jaeger's and MacAdams' claims. Once again, this inference is not warranted with respect to these individuals. First, if the Board wanted to subpoena the witnesses they could have done so. Second, the majority draws an adverse inference even though the Board did not. Therefore, there is no legal basis upon which this court should apply the inference on appeal.

In conclusion, I would hold that there is no reason to treat Jaeger and MacAdams any differently than the other eight late-recalled employees with respect to the anti-union animus upon which MDI's liability rests. If MDI is guilty at all, which the Board clearly found and the majority upheld, then it should be guilty as to the entire group. There is no reasonable basis to single them out and deny them an opportunity to be compensated for MDI's anti-union activities.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.