# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2303

_____

| | |
|---|---|
| JHP & Associates, LLC, doing business as Metta Electric, | * <br> * <br> * |
| Petitioner, | * <br> * |
| v. | * <br> * |
| National Labor Relations Board, | * <br> * |
| Respondent. | * <br> * |
| _____ | * <br> * |
| Local 1, International Brotherhood of Electrical Workers, AFL-CIO, | * <br> * <br> * |
| Intervenor on Appeal. | * |

_____

No. 03-2549

_____

On Petition for Review of an Order of the National Labor Relations Board.

| | |
|---|---|
| JHP & Associates, LLC, doing business as Metta Electric, | * <br> * <br> * |
| Respondent, | * <br> * |
| v. | * <br> * |
| National Labor Relations Board, | * <br> * |
| Petitioner. | * |

_____

Submitted: November 17, 2003
Filed: March 16, 2004
_____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.
_____

RILEY, Circuit Judge.

JHP & Associates, LLC, doing business as Metta Electric (Metta), petitions this court to review and set aside portions of a decision and order of the National Labor Relations Board (Board). The Board's General Counsel (General Counsel) has cross-applied for enforcement of the Board's order. We grant, in part, the General Counsel's application for enforcement of the Board's order.

## I.    BACKGROUND

Metta, a small electrical contractor in Missouri routinely employing nine to twelve people, is owned by Steve and Kim Tunze, husband and wife. In early September 1999, a Metta employee began talking with fellow employees about unionizing the company. The Tunzes did not want their employees to unionize.

On September 14, 1999, Mr. Tunze met with Michael P. Thomson (Thomson) as part of a scheduled employee evaluation. Thomson was the second employee Metta hired, Metta's most senior employee at the time, and Metta's highest-paid employee. Mr. Tunze met with Thomson to discuss money issues, review Thomson's performance, explain newly established job descriptions, and discuss their relationship, which Mr. Tunze characterized as the most important reason for the meeting. Mr. Tunze told Thomson his productivity appeared to be slipping, his current assignment seemed to be taking too long, and his salary would be reduced to conform to his new job description. At the end of the meeting, Mr. Tunze said he still

-2-

had confidence in Thomson's ability, Thomson was "very much a part" of Metta's plans, and Thomson was a valued employee Metta wanted to retain.

On September 15, Metta employee Matt Stewart (Stewart) told the Tunzes five of their nine employees, including Thomson, were union supporters. Stewart testified that, in response, Mrs. Tunze made a list of the nine employees, and Stewart told Mrs. Tunze the list included five union supporters and four non-union supporters.

On September 16, Mr. Tunze discharged Thomson, informing him "it just wasn't working out." Mr. Tunze then informed the remaining employees he discharged Thomson for poor productivity. When contesting Thomson's claim for unemployment benefits, Metta stated it discharged Thomson because of his "unsatisfactory job performance and poor productivity," and because Thomson was "displeased about change and caused discord among other employees." When responding to the General Counsel during its investigation, Mrs. Tunze characterized Thomson as a "very disgruntled employee" who was "going to affect the productivity and moral[e] of all the other employees because of his display of negative actions."

Between November 1999 and January 2000, Metta conducted an anti-union campaign. On December 9, 1999, Mr. Tunze told his employees Metta would "do anything legally and by any other means to remain an open shop." On January 10, 2000, Local 1 of the International Brotherhood of Electrical Workers (Union) filed unfair labor practice charges against Metta for firing Thomson and unilaterally increasing pay for certain employees. On February 18, the Union won a representation vote; on February 28, the Union was certified as the bargaining representative of Metta's employees. On March 9, Metta unilaterally changed certain terms and conditions of employment without bargaining with the Union. On March 10, the Union objected and requested that Metta bargain. Five days later, the Union went on strike based on Metta's failure to bargain and the unilateral changes. Metta hired replacement employees, and the Union found replacement work for its striking members. On April 5, the Union asked Metta for the names, home addresses, and

home telephone numbers of Metta's replacement employees. Metta refused to provide the requested information.

Based on the Union's unfair labor practice charges, the General Counsel issued a complaint against Metta for violating (1) section 8(a)(1) of the National Labor Relations Act (NLRA) by interrogating and threatening employees, (2) sections 8(a)(1) and 8(a)(3) by discharging Thomson, (3) section 8(a)(5) by making unilateral changes to the terms of employment, and (4) section 8(a)(5) by failing to provide the Union with the requested information. Metta asserted no unfair labor practice charges against the Union. Attempting to bypass a hearing by submitting the case to the Board on record evidence only, the parties offered a joint stipulation of facts, which contained the following stipulations: "13. About September 16, 1999, [Metta] terminated [Thomson]. 14. [Metta] was motivated, in part, to engage in the conduct described above in paragraph 13 because [Metta] believed [Thomson] joined the Union and engaged in concerted activities, and to discourage employees from engaging in these activities." The Board rejected the stipulation for purposes of deciding the case without a hearing, "because it contains ambiguities that may prevent resolution of the dispute." Specifically, the Board recognized paragraph 14 stated Metta was motivated, in part, to discharge Thomson because Metta believed Thomson had engaged in union activities, but noted the stipulation was "silent as to whether Thomson would have been discharged even in the absence of [Metta]'s belief that he engaged in union activities."

An administrative law judge (ALJ) held a hearing on the charges, and found Metta had violated the NLRA as the General Counsel alleged. In reaching his decision, the ALJ relied, in part, on the unambiguous portions of the stipulation of facts, as well as live testimony.[1] The General Counsel did not call Thomson to testify

---

[1]Metta contends the stipulation of facts is irrelevant, because the Board rejected the stipulation in the first instance. We reject Metta's contention. The Board based its decision, in part, on the stipulation of facts, which was attached to the parties'

at the hearing, even though he was available. Affirming the ALJ's rulings, findings and conclusions, the Board adopted the ALJ's recommended order. Metta petitions this court for review of the Board's order, asking us to set aside the findings that Metta violated (1) sections 8(a)(1) and 8(a)(3) by discharging Thomson, and (2) section 8(a)(5) by not providing the Union with the names, home addresses, and home telephone numbers of the replacement employees. The General Counsel cross-applies for enforcement of the Board's order.

## II.    DISCUSSION
### A.    Overview

Section 7 of the NLRA provides employees certain rights: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2000). Section 8(a) contains unfair labor practices applicable to employers: "It shall be an unfair labor practice for an employer– (1) to interfere with, restrain, or coerce employees in the exercise of [their section 7] rights; . . . (3) [to] discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; . . . [and] (5) to refuse to bargain collectively with the representatives of his employees." Id. § 158(a).

The Board's factual findings are conclusive if substantial evidence supports them. Id. § 160(e)-(f). Thus, we will enforce the Board's order "so long as the Board

_____

motion to transfer the proceedings to the Board, and which was admitted at the hearing without objection. The ALJ properly relied on the unambiguous stipulated facts, including Metta's admission it was motivated, in part, to discharge Thomson because of his union activities and to discourage employees from engaging in union activities. Metta's admission is not vague and goes to the heart of the discriminatory discharge issue.

has correctly applied the law and substantial evidence in the record supports its findings." New World Communications v. NLRB, 232 F.3d 943, 945 (8th Cir. 2000).

### B.    Adverse Inference Rule
#### 1.    Discriminatory Discharge

An employer violates sections 8(a)(1) and 8(a)(3) of the NLRA when the employer (1) discharges an employee for engaging in, or even for mistakenly believing an employee is engaging in, protected union activity or (2) discourages other employees from engaging in union activity. See JCR Hotel, Inc. v. NLRB, 342 F.3d 837, 840 (8th Cir. 2003); Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1510 (8th Cir. 1993). Relying on NLRB v. MDI Commercial Services, 175 F.3d 621 (8th Cir. 1999), Metta argues the General Counsel's failure to have Thomson testify at the hearing is fatal to its claim that Metta's discharge of Thomson violated the NLRA. Metta contends the Board failed to follow the adverse inference rule discussed in MDI Commercial Services. According to Metta, the adverse inference rule required the Board to infer Thomson's testimony would have supported Metta's reasons for discharging Thomson, precluding a finding that Metta had violated the NLRA.

Metta hitches its entire adverse inference argument to MDI Commercial Services, but that decision cannot pull the load. Although it may appear from MDI Commercial Services that the adverse inference rule is mandatory in all cases where a potential material witness is within the General Counsel's control, that has never been our holding and is not today. In Rockingham Machine-Lunex Co. v. NLRB, 665 F.2d 303, 305 (8th Cir. 1981), our court stated "[t]he adverse inference rule is an important one that should be applied by the Board whenever it is appropriate." We then announced "[t]he rule permits an adverse inference to be drawn; it does not create a conclusive presumption against the party failing to call the witness." Id. (emphasis added).

In MDI Commercial Services, 175 F.3d at 627-28, the material issue in dispute was whether the employer discharged the employee or whether the employee quit.

Because the General Counsel failed to call the employee, who possessed vital answers to critical questions surrounding the discharge-quit issue, we determined the failure to call this employee to testify required the Board to draw an adverse inference against the General Counsel. Id. at 628 (citing Rockingham Machine-Lunex Co., 665 F.2d at 304-05). In addition to the adverse inference, we also recognized the employee testified in state unemployment compensation proceedings, which concluded the employee quit. Id. This independent evidence, along with corroborating testimony from other witnesses, supported the adverse inference drawn from the General Counsel's failure to call the employee who was a "most critical" witness. Id. Based on the facts of that case, an adverse inference was not only permitted, but required.

A fair reading of our caselaw, both before and after MDI Commercial Services, does not substantiate Metta's claim that the Board was required to draw an adverse inference against the General Counsel for failing to call Thomson as a witness. See New World Communications, 232 F.3d at 946 (recognizing that, despite the language used in MDI Commercial Services, 175 F.3d at 628, the adverse inference rule is generally permissive, citing Rockingham Machine-Lunex Co., 665 F.2d at 305). The Board, as the factfinder, was free to reject the adverse inference rule if the facts warranted such a rejection.

The adverse inference rule requires the missing witness's testimony be relevant and significant. Thomson's testimony was hardly relevant and was not significant in determining Metta's motive for discharging him. In the stipulation of facts, Metta candidly admitted it was motivated, in part, to discharge Thomson for his union activities and to discourage other employees from engaging in union activity. However, Metta argued it would have discharged Thomson regardless of that anti-union sentiment. Thus, the Board was confronted with a mixed motive case, requiring it to determine whether Metta would have discharged Thomson absent Metta's belief Thomson had engaged in protected union activity. As such, the Board was not concerned with Thomson's testimony. The hearing focused on Metta's

motivation, outside of its anti-union animus, for discharging Thomson. Thomson would have been unable to testify as to Metta's motivation for discharging him. Even if Thomson had testified he was anti-union, lazy and worthy of discharge, Metta could still have erroneously perceived Thomson to be pro-union and a threat to the non-union company, discharging Thomson in violation of the NLRA. See Concepts & Designs, Inc. v. NLRB, 101 F.3d 1243, 1244 (8th Cir. 1996) ("Motivation is a question of fact that may be inferred from both direct and circumstantial evidence."). Thus, the Board was not required to apply the adverse inference rule to Metta's motivation for discharging Thomson.

Although Metta gave non-discriminatory reasons for discharging Thomson, the ALJ found those reasons pretextual to disguise the true motivation for Thomson's discharge–his perceived union support. In making such a finding, the ALJ deemed Mrs. Tunze's testimony incredible, stating she was not candid or forthright. When determining whether the Board's decision is supported by substantial evidence, we afford great deference to the ALJ's credibility determinations. Wright Elec., Inc. v. NLRB, 200 F.3d 1162, 1166 (8th Cir. 2000); Golden Eagle Spotting Co. v. Brewery Drivers & Helpers, Local Union 133, 93 F.3d 468, 471 (8th Cir. 1996) ("We will not overturn Board findings that are based on credibility determinations unless those findings shock the conscience.").

When Mrs. Tunze's testimony is discounted, Metta's defense falters. The stipulation demonstrates Metta discharged Thomson, at least in part, to send an anti-union message to its employees. Metta was clearly an anti-union employer trying to remain union-free. This fact is supported by the uncontested findings Metta committed unfair labor practices, and by Metta's anti-union campaign, including its announcement it would "do anything legally and by any other means to remain an open shop." After the ALJ found Mrs. Tunze's testimony incredible, we are left with a record showing Mr. Tunze evaluated Thomson and indicated he was a valuable employee who was very much a part of Metta's future. Within a day after discovering Thomson was a union supporter, Metta discharged Thomson. Then, over the ensuing

months, Metta provided inconsistent reasons for the discharge–reasons the ALJ specifically rejected.

When conflicting evidence is presented to the Board, "we may not preempt 'the Board's choice between two fairly conflicting views' of that evidence." See MDI Commercial Services, 175 F.3d at 626 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). Concluding substantial evidence in the record supports the Board's finding of discriminatory discharge, we grant enforcement of the Board's order on this issue.

### 2. Reinstatement Offer

Metta contends it unconditionally offered reinstatement to Thomson on May 4, 2000, and paid him back pay.[2] Metta argues the adverse inference rule required the Board to infer Thomson was offered reinstatement, because Thomson did not testify at the hearing. Although this scenario tracks circumstances where the adverse inference rule may be applied, see MDI Commercial Servs., 175 F.3d at 628 (requiring application of adverse inference rule when absent witness under General Counsel's control possesses critical testimony), the Board has not yet decided the reinstatement issue. Instead, the Board postponed ruling on the issues of reinstatement and back pay until the compliance phase of these proceedings. As we have nothing to review, enforce, or set aside relating to reinstatement and back pay, we cannot provide the relief Metta seeks.

### C. Information Request

At the hearing, a Union representative testified he needed the names, home addresses, and home telephone numbers of the strike replacement employees to contact them to determine their bargaining goals. Metta contends it refused the Union's request for this information because the request was nothing more than an

---

[2]This evidence was contained in the same stipulation of facts which Metta contends is irrelevant when discussing Metta's reasons for discharging Thomson.

attempt to strip Metta of its employees and drive it out of business. Finding Metta violated sections 8(a)(1) and 8(a)(5) of the NLRA by withholding the requested information, the Board ordered Metta to provide the Union the names, addresses, and telephone numbers of all replacement employees.

It is well settled an employer has a general obligation to provide information necessary for an elected union to properly perform its duties. NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36 (1967). A failure to provide this necessary information violates sections 8(a)(1) and 8(a)(5) of the NLRA. Procter & Gamble Mfg. Co. v. NLRB, 603 F.2d 1310, 1315 (8th Cir. 1979). However, "the employer's duty to supply information turns on the circumstances of the particular case." Grinnell Fire Prot. Sys. Co. v. NLRB, 272 F.3d 1028, 1029 (8th Cir. 2001) (citing Detroit Edison Co. v. NLRB, 440 U.S. 301, 314 (1979)). An employer may withhold relevant information "when the interest in confidentiality outweighs the union's need for the information." Id. Our court has recognized "employees do not have an extreme privacy interest in their names, which are commonly known in the workplace, but have a greater privacy interest in protecting the location of their homes, even though there is no evidence of threats of violence." Id. at 1030; see also Chicago Tribune Co. v. NLRB, 79 F.3d 604, 607-08 (7th Cir. 1996) (holding employer was required to provide the names of replacement employees, but not their home addresses, because of safety concerns, privacy rights and the union's ability to communicate with the employees through alternative means).

The particular facts of this case do not show a compelling need for the Union to obtain the strike replacement employees' home addresses and telephone numbers. The record shows a routine request for this information so the Union can understand the bargaining goals of the strike replacement employees. Recognizing these replacement employees diminished the impact of the Union-initiated strike, we conclude the Union has not shown a compelling need for this confidential information.

Without the Union making a greater showing of need for the employees' home addresses and telephone numbers, we will not require disclosure of this personal and confidential information. We have no doubt the Union, armed only with the names of the strike replacement employees, will have enough information to contact those employees should the Union deem it necessary to talk to or to represent the strike replacement employees.[3] We conclude Metta committed an unfair labor practice by refusing to provide the Union with the names of the strike replacement employees; however, Metta did not commit an unfair labor practice by refusing to provide the Union with these employees' home addresses and home telephone numbers.

### D. Enforcement of Uncontested Issues

The General Counsel seeks summary enforcement of the portions of the Board's order unchallenged by Metta on appeal. Metta has not disputed the Board's entitlement to such enforcement. Therefore, we summarily enforce the unchallenged portions of the Board's order. See Golden Eagle Spotting Co., 93 F.3d at 471.

## III. CONCLUSION

For the reasons discussed, we grant the General Counsel's application for enforcement of the Board's order, with the exception of the portion of the order requiring Metta to disclose the home addresses and home telephone numbers of the strike replacement employees.

———————————————————

---

[3]We realize Metta never specifically argued confidentiality requires non-disclosure of the requested information. The confidentiality of strike replacement employees' home addresses and home telephone numbers should always be a factor to weigh against a union's need for such information.